## Osborne's Administrator v. Cincinnati, New Orleans & Texas Pacific Railway Company.

(Decided March 24, 1914.)

### Appeal from Pulaski Circuit Court.

1. Master and Servant—Hours of Service Act—Construction of.— Under the Federal Hours of Service Act, an employe is not engaged in service within the meaning of the Act unless he is actually engaged in or connected with the movement of a train. And so a brakeman is not engaged in service when he is on his way from his home to his work, although he left his home in obedience to an order of the company directing him to report for service connected with the movement of the train.

2. Master and Servant—Hours of Service Act—Construction of.— "Dead-heading."—A brakeman who is "dead-heading" from one point to another on the road under direction of the company so that he may be able to report for duty at the place to which he is going, is not, while so "dead-heading," engaged in service within the meaning of the Act, when he has no duties to perform in connection with the movement of the train on which he is "dead-heading."

3. Master and Servant—Hours of Service Act—Construction of.— When Service Begins.—When an employe, in obedience to a rule of the company, reports for train service a half hour before the time fixed for the departure of the train. this time is to be counted in computing the hours of service if he is ordered to report so that he may perform some service in connection with preparing the train for its departure.

4. Master and Servant—Action to Recover Damages for Negligence—Proof of Negligence Required.—When it is sought to recover damages for negligence or wrongful acts, there must be some evidence to show that the injury complained of was caused by the negligence of the defendant, and this evidence must be sufficient to charge the defendant with a breach of duty. A recovery cannot be had on mere surmises or specula-

tions as to how the injury happened, nor will it be presumed that the defendant was guilty of actionable negligence.

5.  Master and Servant—Action for Damages—Proof of Negligence Necessary.—Mere proof of the injury, with attending circumstances, is not sufficient. There must be some evidence conducing to show that the injury was caused by the negligence of the defendant. When the plaintiff merely presents theories as to how the accident happened or speculative reasons that caused it, no recovery can be had.

R. A. JACKSON,   R. B. WADDLE,   E. V. PURYEAR,   J. W. RAWLINGS and ROBERT HARDING for appellant.

O. H. WADDLE & SONS and JOHN GALVIN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

F. H. Osborne was a brakeman in the employ of the appellee company on a local freight training running between Oakdale, Tennessee, and Somerset, Kentucky, and was killed by falling from the train. The train on which he was a brakeman was engaged in interstate commerce, and he was employed by it in such commerce at the time of his death on January 17, 1912. In this action by the administrator to recover damages for the death of Osborne, this suit was brought under the Federal Statute known as the Employers' Liability Act, against the Railway Company, N. B. Smith, the engineer, and Jim Davis, the conductor of the train on which Osborne was brakeman. It was alleged in the petition that on January 17th:

"The defendant company required its employes connected with trains to be and hold themselves subject to call and to go upon duty when called, and that it so required its employes and plaintiff's intestate at the time of the wrongs and injuries hereinafter complained of to report for and go upon duty thirty minutes before the time scheduled for the leaving of the train to which they were assigned, and the plaintiff avers that his intestate, Osborne, was called by defendants and went upon duty at 5:30 a. m. on the 17th day of January, 1912, upon said train of defendants engaged in interstate commerce between Kentucky and Tennessee on said day, and was continuously on duty from said time until the time on said day when he was killed by being thrown from said train on its return trip from Oakdale to Somerset, and he avers that at the time his intestate was killed said intestate had been continuously on duty as an employe of the company,

under the control of the defendants, for more than six-teen consecutive hours, and was still on duty and said train still in operation and his intestate was continuously at work on said day more than sixteen hours next before his death, and that the run of said train on said day con-sumed more than sixteen consecutive hours, and by rea-son thereof and of the joint and concurring acts of gross negligence of the defendants, in running said train at a high and dangerous rate of speed over a new, unsettled track, and the joint and concurrent gross negligence of defendants in so running at said time, and place and in requiring his intestate to be and remain on duty more than sixteen hours * * * plaintiff's intestate, in his weak and wearied condition, caused by the acts herein com-plained of, was caused to fall or be thrown from said train and be killed.''

In an amended petition, which was tendered but on objection of defendants was not allowed to be filed, it was averred ''that his intestate was on duty and serving defendant company on its train and in its service for more than sixteen hours in the aggregate in the twenty-four hours immediately preceding the time of his death without having the eight hours rest as required by law, and the defendants required and permitted him to be on duty and to be in the service of the company and to serve said company for said period of more than sixteen hours in said twenty-four hours immediately preceding his death, and without having the eight hours rest required by law.''

In another amended petition that was filed, it was averred ''that at the time of the death of the intestate he left surviving him a wife and two children, one of them about two years old and the other born on the day of his funeral, and said children and said wife were pecuniar-ily dependent upon him for maintenance and support and they had no other means of maintenance and support.''

The answer was a traverse of the petitions and a plea of contributory negligence.

In due time the case went to trial before a jury, and upon the conclusion of the evidence for the plaintiff, the court directed a verdict for the defendants, and accord-ingly there was a judgment dismissing the petition, fol-lowed by this appeal.

The Federal Statute chiefly relied on to sustain a re-covery, and the violation of which it is alleged caused the death of Osborne, is known as the Hours of Service Act.

This act defines an employe as follows: "And the term 'employes' as used in this Act shall be held to mean persons actually engaged in or connected with the movement of any train."

In Sec. 2 it is provided: "That it shall be unlawful for any common carrier, officers or agents, subject to this Act to require or permit any employe subject to this Act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employe of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employe who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: Provided, that no operator, train dispatcher, or other employe who by the use of the telegraph or telephone dispatches reports, transmits, receives or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places and stations operated only during the daytime, except in case of emergency, when the employes named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four-hour period on not exceeding three days in any week: *Provided further,* the Interstate Commerce Commission may after full hearing in a particular case and for good cause shown extend the period within which a common carrier shall comply with the provisions of this proviso as to such case."

In considering the case we will treat it under two heads; first, as relates to the hours of labor Osborne was engaged; and, second, as relates to the negligence that it is alleged was the immediate cause of his death.

The local freight train and crew of which Osborne was a member arrived in Somerset, Kentucky from Oakdale, Tennessee on the morning of January 16th about 1:35 a. m. At about 9:30 a. m. on the same day Osborne and another brakeman named Butcher were told by the yard master to "dead-head" back to Oakdale on that

day on a passenger train, so that they could leave Oakdale with their train on the morning of the 17th. In obedience to this order they went to the depot at Somerset about twelve o'clock to get a passenger train on which to "dead-head" to Oakdale. A local passenger train passed about one'clock but they did not take this train, concluding to wait a little while and take a fast passenger train which, if on time, would get them to Oakdale before the local did; but it seems that the fast passenger train was several hours behind time, and did not leave Somerset until 8:30 p. m., and they arrived at Oakdale about 12:45 a. m. on the 17th.

Soon after this Osborne went to his boarding house, and was called at 5:30 a. m. on the 17th by the call-boy of the railroad company. In answer to this call he got up and left the house at 5:40 a. m. to go to the yard, where the train, on which he was brakeman, and that was due to leave Oakdale on its return trip to Somerset at 6:15 a. m., was being made up. His boarding house was only a short distance from the yard, and in the ordinary course of travel Osborne could have reached the yard about 5:45 a. m., or about 30 minutes before the schedule time for the departure of his train, although the uncontradicted evidence is that he was not seen about the train or yard until a few minutes before the train left, about 6:30. Where he was between the time he left the house and the departure of the train, is not shown. He was, however, ready for duty when the train left a few minutes after its schedule time.

It further appears from the evidence that when this train got within about 25 miles of Somerset it quit doing local work and made the run into Somerset without stopping. Soon after the train quit doing local work Osborne went into the caboose and fell asleep. At Burnside the conductor wakened him, and, upon inquiring and being told where the train was, he said that as soon as it passed through a tunnel near Burnside and between there and Somerset, he would go over the train to the engine and ask the engineer to slow down and let him off at a crossing in Somerset near his home. When the train passed through this tunnel Osborne, with his lantern in his hand, went out of the caboose to go to the engine, and was last seen by one of the brakemen going over the train between U. S. Junction and Cedar Grove. When the train got to Somerset the absence of Osborne was discovered and his body was later found at Cedar Grove.

The evidence further shows that U. S. Junction is 5.9 miles from Somerset, and that Cedar Grove is about 5 miles from Somerset.    The train dispatcher's record shows that this train passed U. S. Junction at 9:44 and arrived at Somerset at 9:50. The engineer testified that between Burnside and Cedar Grove, and when passing U. S. Junction, the train was running at a speed of about 30 miles an hour, but that when he got to Cedar Grove he ran from there into Somerset at a speed of 45 miles or more an hour.    In other parts of his evidence he said that he ran from U. S. Junction to Somerset in "about five minutes."    And there is other evidence showing that between U. S. Junction and Burnside two slow-downs were made to a speed of about ten miles an hour.    As the distance from U. S. Junction to Somerset was nearly six miles, if there is taken into account the time lost in the two slow-downs, the train, if the dispatcher's record is correct, ran the distance between U. S. Junction and Somerset at a speed of more than 60 miles an hour and according to this record Osborne was killed not later than 9:45 although his watch which was found near his body stopped at 9:43.

Turning now for a moment to the hours of labor Osborne was engaged, it will be seen that if the train had left Oakdale on schedule time at 6:15 a. m. and Osborne was killed at 9:45 p. m., the time he was engaged on the run would be 15 1-2 hours; but it is insisted that there should be added to this the time between 5:30 when he was called and 6:15 when his train was due to leave, which would make the hours of service 16 1-4 hours.    It is further said that in any event the hours of service should be computed from 5:45, as the rules of the company required Osborne to be at the yard 30 minutes before the time fixed for the departure of the train.    If, however, this 30 minutes should be allowed, it would only make the hours of service 16, or from 5:45 to 9:45, but if the hours are to be counted from the time he was called, then the hours of consecutive service would be more than 16.

There is some conflict in the evidence as to whether the rules of the company required Osborne to be at the yard 30 minutes before the schedule time for the departure of the train, but it is not necessary to comment on this point further, because if it should be assumed that Osborne reported for duty at 5:45 he would not have been

engaged more than 16 consecutive hours, and therefore no violation of the statute was committed. Nor do we think the hours of service should be computed from the time he was called at 5:30 a. m., or from the time he left his boarding-house at 5:40 a. m., or that the hours of service of an employe such as Osborne was commence until, under the rules of the company, he has some duties to perform connected with the movement of the train on which he is engaged, and has reported at the proper place for the performance of these duties.

It will be observed that the Act provides that "It shall be unlawful for any common carrier, its officers or agents, subject to this Act to require or permit any employe subject to this Act to be or remain on duty for a longer period than sixteen consecutive hours," and defines employes to mean "Persons actually engaged in or connected with the movement of any train." So that an employe does not come within the protection of the Act, nor does the railroad company violate its provisions, unless and until the employe shall have been on duty for a longer period than sixteen consecutive hours while actually engaged in or connected with the movement of a train. Under this Act the hours of service do not begin when the employe is directed to go to a place to work in connection with the movement of the train on which he is engaged, or until he is required to be and is present at the proper place able and ready to do something connected with the movement of the train.

For example, if trainmen were required to be at the place of departure 30 minutes before the train left for the purpose of inspecting the train or performing any other duty in connection with its contemplated movement, this 30 minutes should be included in the hours of service if the employe was at his post of duty during this time.

The act does not mean that the hours of service connected with the movement of the train only begin when the train has actually started on its journey or that these hours are only to be computed during the time that the train is actually running. A narrow construction like this would in many instances rob the employe of the benefit of many minutes as well as hours during which he might be connected with the movement of the train in preparing it for departure or in serving it in some way when delayed on its journey. Upon this point the Fed-

eral decisions are uniform in holding that the hours of service are not confined to the actual running time of the train. These decisions, while also uniform in giving to the Act a liberal construction to carry out its humane and life-saving purpose, are yet agreed that the employe must be actually engaged in or connected with the movement of the train before he brings himself within the scope of the Act.

Thus in U. S. v. Missouri Pacific Ry. Co., 206 Fed., 847, the question was, as stated by the court, "Shall the time spent by the fireman as watchman in charge of his engine being drawn by another engine to the terminal station be computed in the hours of service as contemplated by the statute?" And the court said: "While it is quite clear a watchman so in charge of an engine has no control over the train movement, hence is not actually engaged in such movement, it is not clear that he is in no manner connected with the movement of the train.

"While the question presented is, so far as I find, of first impression, yet, considering the remedial nature and humane purpose of the act, the character of the duties imposed upon such watchman, as stipulated by the parties, and all the facts and circumstances presented by the record to which consideration should be given, I am forced to the conclusion the time so spent by a locomotive fireman in watching his engine must be computed as hours of service within the purview of the act, and for the following among other reasons which might be given * * *." To the same effect is U. S. v. Great Northern R. R. Co., 206 Fed., 838.

In U. S. v. Chicago M. & P. S. Ry. Co., 195 Fed., 783, the agreed facts showed that the trainmen were required to report for duty 30 minutes before the departure of trains and were allowed 15 minutes after the arrival of trains at destination to inspect. The question for decision, as stated in the opinion, was: "Does the statutory limitation of time of continuous service applicable to engineers, firemen, conductors, and brakemen employed in the operation of trains include, or exclude, the time on duty preceding and subsequent to the time of service in actual operation of trains between the terminal points at which their runs are commenced and ended?" And the court said: "An employe is on duty when he is at his post in obedience to rules or requirements of his superior and ready and willing to work,

whether actually at work or waiting for orders or for the removal of hindrances from any cause.''

In U. S. v. Chicago, M. & P. S. Ry. Co., 197 Fed., 624, the train crew was allowed from 30 to 45 minutes for breakfast, and about one hour each for the mid-day and evening meals. At meal time the crew was relieved from duty and a watchman placed in charge of the train. If the time allowed for meals be deducted from the time allowed for service, the crew was not employed for sixteen consecutive hours; but if these deductions be not made, it was admittedly employed for a longer period than allowed by law, and the court held that this time allowed for meals should be counted as a part of the hours of service during which the crew was engaged.

In U. S. v. Denver & Rio Grande R. R. Co., 197 Fed., 629, there was a rule of the company requiring the train crews to report for service 30 minutes before leaving time, and pursuant to this each person was at the point from which the train departed 15 minutes before its departure, and it also appeared that the particular crew in question was delayed at a station 55 minutes awaiting the arrival of another train. The question was whether in computing the sixteen hour period the preparatory service of 15 minutes and the 55 minutes stop broke the continuity of the service, or should be counted in estimating sixteen consecutive hours of service, and the court said:

''Manifestly, however, they mean to be either actually engaged in work or to be charged with present responsibility for such, should occasion for it arise. Tested by this definition the crew during the preparatory 15 minutes was clearly on duty. They were at the starting point pursuant to a rule of the defendant company requiring them to be there. They were engaged in work necessary to the trip. The conductor, according to the proof, was getting his bills and orders, the brakemen were looking over the train to detect defective cars and equipment and in going to the roundhouse to bring the engines and to couple them to the train. With all of these unperformed the train could not have moved. With some unperformed the train would probably have moved only to destruction for lack of orders or of safe equipment. These duties were quite as important as those after the train started, and, contrary to what counsel contend, impress us as constituting quite as great a strain upon the

nervous and physical energies as arose after the train was actually in motion.'' And further ruled that the time the train was laid up at the station should be included in computing the hours of service.

In U. S. v. Illinois Central R. R. Co., 180 Fed., 630, the question was whether an engineer who was required to and did report for duty before the time fixed for the departure of the train was engaged in service within the meaning of the act, and the court said:

''In my opinion this man was on duty, within the meaning of the act, from the time he went there and commenced to supervise, or overlook that engine in preparation for the trip. It does not make any difference whether he was paid for that time or not, that was the time his work and the strain on him began. The work of a man, an employe of the railroad, begins when under the rule of the company he is there and is at work in connection with the preparation of the engine for the moving of that train.''

In Missouri, Kansas & Texas Ry. Co. v. U. S., 231 U. S., 112, 58 L. Ed., * * * the question was whether trainmen were on service during the time the train was delayed at a station waiting for repairs to the engine, and the court said: ''But they were under orders, liable to be called upon at any moment, and not at liberty to go away. They were none the less on duty when inactive. Their duty was to stand and wait.'' To the same effect is U. S. v. Atchison, Topeka & Sante Fe R. R., 220 U. S. 37, 55 L. Ed., 361; U. S. v. Kansas City Southern R. Co., 189 Fed., 471.

But the time that the employe may occupy in going from his home or any other place to the point at which his duties connected with the movement of the train are to begin should not be counted in estimating the hours of service he is employed, because during this time he is not, within the meaning of the Act, engaged in any service connected with the movement of the train. He is only preparing to put himself in a position where he can render some service connected with the movement of a train.

It is said, however, that, although Osborne may not have been engaged sixteen consecutive hours, he was, nevertheless, on duty sixteen hours in the aggregate in twenty-four without having had eight consecutive hours of duty, and therefore, that provision in the Act reading:

"And no such employe who has been on duty sixteen hours in the aggregate in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty," applies to this case.

Without going into details as to the time Osborne was engaged on duty in the twenty-four hours preceding 6:15 a. m. on the morning of the 17th., it is sufficient for the purposes of this case to say that if the time during which Osborne was "dead-heading" on the 16th between Somerset and Oakdale is to be counted as hours of service, he had been on duty sixteen hours in the aggregate in a twenty-four-hour period without having had eight consecutive hours off duty before he left Oakdale on the morning of the 17th. at 6:15 a. m. So that the question arising is, was Osborne engaged in service within the meaning of the Act while "dead-heading" during the five hours that it took the passenger train on which he was riding to run from Somerset to Oakdale?

He had been ordered by the train dispatcher to "dead-head" from Somerset to Oakdale so that he might be in Oakdale on the morning of the 17th in time to leave with his train at 6:15 a. m., and it is shown that he received compensation for the time it took the train on which he was "dead-heading" to run from Somerset to Oakdale. The record further shows that when a railroad employe is "dead-heading," as Osborne was, in going from Somerset to Oakdale on the 16th, he does not have any duties whatever to perform in connection with the movement of the train on which he is "dead-heading;" that he really occupies the attitude of a passenger free from any care or responsibility relating to the operation or management of the train.

Although we have made a very thorough examination of the cases involving the construction of this Act, we have not found one presenting or deciding the question whether an employe who is "dead-heading" is engaged in service connected with the movement of any train within the meaning of the Act.

The Interstate Commission, however, has promulgated rule No. 74 providing that "Employes 'dead-heading' on passenger trains or on freight trains and not required to perform, and not held responsible for the performance of, any service or duty in connection with the movement of the train upon which they are 'dead-

heading' are not while so 'dead-heading,' 'on duty' as that phrase is used in the act regulating the hours of labor.'' This construction, although it does not have the binding force of a court decision, is yet entitled to great weight on account of the important duties this high Commission exercises in administering these remedial Federal statutes, and we concur in its soundness when applied to the facts of this case. Opposing this interpretation, the argument is made for the plaintiff that this act should be so construed as to secure for employes relief from cares or responsibilities or orders or authority of any kind connected with their employment during the hours of rest specified in the Act. And it is said this means that the employe during this rest period shall not be subject in any manner or for any purpose to the orders or directions of his superiors but shall be free to go and come as he pleased and do what he wishes, taking his allotted rest in such manner as suits his pleasure. That, although Osborne did not have any duties to perform in connection with the movement of the train on which he was riding or the movement of any other train, he was, nevertheless, on duty in the sense that he was acting under the orders and directions of a superior and did not have the full and free opportunity contemplated by the statute to take subject to his own volition the rest allowed.

There is much force in this position, and if the Act permitted us to do so we would be disposed to say that an employe was engaged in service when he was acting under the orders or directions of a superior, although these orders or directions might not impose upon him the performance of any particular duty in connection with the movement of any train. But the Act is not fairly susceptible of this construction. In carefully chosen words it describes an employe as a person who is "actually engaged in or connected with the movement of any train," and the hours of service feature of the Act only apply to such a described person. Manifestly Osborne was not actually engaged in or connected with the movement of the train on which he was "dead-heading," because the uncontradicted evidence is that he had no duties of any kind or character to perform in connection with the movement of this train and was not charged with any responsibility in relation thereto; nor could he have been engaged in or connected with the movement of the

train on which he was to leave Oakdale at 6:15 a. m. the following morning, for the train on which he was riding as a "dead-head" reached Oakdale at 12:45, and the train on which he was a brakeman was not due to leave there until 6:15 a. m. The hours of service he was engaged did not begin when he was ordered to "dead-head" any more than they did when he was called at 5:30 a. m,. to leave his boarding-house. The plain reading of the Act forbids its application to an employe who is not actually engaged in or connected with the movement of any train, and the railroad company does not violate the Act, nor does the employe come within its protecting provisions unless it be shown that he was actually engaged in or connected with the movement of the train in the manner we have described for a longer period than the Act allows without having the rest allowed by the Act.

This being our construction of the Act, Osborne, at the time of his death, had not been engaged in service for a longer period than sixteen consecutive hours, nor had he been on duty sixteen hours in the aggregate in twenty-four without having had at least eight consecutive hours off duty before he again went on duty, as when there is added to the five hours' rest he had at Oakdale between 12:45 and 5:45, the time he was "deadheading," he was off duty considerably more than eight hours.

This being so, no cause of action on the part of the plaintiff arises on account of the violation of the Hours of Service Act. We might further add that if the facts showed a violation of this Act it would be doubtful if the plaintiff could make out a case entitling him to recover, because in addition to a violation of this statute it is necessary that the plaintiff shall show some act of negligence on the part of the defendant that, concurring with or attributable to the violation of the Act, contributed to the death of his intestate: St. Louis, Iron Mountain & S. R. R. R. v. McWhirter, 229 U. S., 265, 57 L. Ed., 1179. Although it might well be said under the authority of the McWhirter case that where a violation of this Act is shown it would require very slight evidence of other concurring or connected acts of negligence to authorize a recovery.

Coming now to the other act of negligence that it is insisted entitled the plaintiff to go to the jury, the ques-

tion is; does the evidence show a cause of action in plaintiff independent of the hours of service act arising out of any negligence in the operation of the train that was the proximate cause of the death of Osborne? As before stated, there is evidence tending to show that at the time Osborne was killed the train was running at a high, dangerous and reckless rate of speed, but there was no evidence that its movement was accompanied by any·unusual and unnecessary jerks, or indeed any jerks other than those that usually accompany the movement of trains. The track was good and the equipment in perfect order. There is not in the record a fact or circumstance from which it can be reasonably or fairly inferred that Osborne's death was caused by the speed of the train. What caused it, no one knows. When last seen alive he was going over the train, and when next seen, he was lying dead near the track. Under these circumstances it would be pure speculation to assume the immediate cause of his death. In going over the train he may have slipped and fallen, or he may have stumped his toe and fallen, or he may have in some way lost his balance and fallen, or some jerk of the train may have thrown him off.

We have frequently had before us cases like this in which a recovery was sought when the evidence was not sufficient to connect the death of the intestate with any proven negligence of the defendant and the uniform ruling of the court has been that to entitle the plaintiff to recover in such a case there must be some evidence conducing to show that the death of his intestate was caused by the negligence of the defendant. In Stuart v. N. C. & St. L. Ry. Co., 146 Ky., 127, it was said:

"In cases like this, no presumption is to be indulged in against the deceased, nor is it required that the plaintiff who is seeking to recover damages for his death shall show that he was free from blame. Warren v. Jeunessee, 122 S. W., 862; Cumberland Telephone & Telegraph Co. v. Graves, 104 S. W., 356; Lexington & Carter County Mining Co. v. Stephens, 104 Ky., 502. But in all cases of this character where it is sought to recover damages for negligence or wrongful act, there must be some evidence to show that the deceased lost his life through the negligence of the defendant, and this evidence must be sufficient to charge the defendant with a breach of duty. A recovery cannot be had on mere surmises or specula-

tion as to how the injury that is complained of happened, nor will it be presumed that the defendant was guilty of actionable negligence. If the injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability, then the well settled rule is that a recovery cannot be had."

Again in Hughes v. Cincinnati R. Co., 91 Ky., 526 the court said:

"We are left to theorize as to it. One suing to recover damages for injury arising from another's neglect must offer some testimony conducing to show that it was so occasioned. Negligence cannot be presumed in a case like this one. The presumption is the other way. It cannot be found without evidence. The complaining party must not only show the injury, but also some evidence tending to show that the other party is to blame for it. Mere proof of the injury, with attending circumstances showing that the party charged with neglect may be blameless, or may be at fault, will not do. In such a case, there is no evidence tending to show that the injury was due to neglect. Circumstances are merely presented upon which one may theorize as to the cause of the accident. The burden of showing neglect rests upon the complainant, and under such circumstances he has offered no evidence tending to show it. He has merely presented two or more states of case upon which one may theorize as to the cause of the accident."

To the same effect are: Hurt v. L. & N. R. R. Co., 116 Ky., 545; Early v. Louisville, Henderson & St. Louis Ry. Co., 115 Ky., 13; Conway v. L. & N. R. R., 135 Ky., 229; L. & N. R. R. v. Long, 139 Ky., 299; Caldwell v. C. & O. Ry., 155 Ky., 609.

Upon the whole case we think the circuit court correctly ruled that the plaintiff failed to make out a case entitling him to go to the jury, and the judgment is affirmed.