### DENVER & R. G. R. CO. v. UNITED STATES.

### UNITED STATES v. DENVER & R. G. R. CO.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1916.)

Nos. 4483, 4484.

1. MASTER AND SERVANT ☞13—HOURS OF SERVICE—DISCHARGE OF TRAIN CREW.

Where, after derailment, the crew of a freight train while awaiting the arrival of a derrick, proceeded about a mile and a half from the point of derailment to a farmhouse, where they left the engine in charge of a watchman and partook of a luncheon and rested under the trees, they were not released from duty, there being no superior present, within Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), and that time must be included in determining whether they were on duty for more than the 16-hour period allowed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

2. MASTER AND SERVANT ☞13—HOURS OF SERVICE—"CONTINUOUS JOURNEY."

Where a freight train proceeded from Salt Lake City to a smaller town, and thence returned, and no crews were kept at the smaller town, and there was no person there competent to take charge of the train, such town must be treated as a way station and the round trip as a "continuous journey," within the Hours of Service Act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

For other definitions, see Words and Phrases, First and Second Series, Continuous.]

3. MASTER AND SERVANT ☞13—HOURS OF SERVICE—DEFENSES—"CASUALTY."

Under Hours of Service Act, § 3 (Comp. St. 1913, § 8679), making it unlawful for any common carrier, its officers, or agents to require or permit any employé to remain on duty for a longer period than 16 consecutive hours, provided that the act shall not apply in case of casualty or unavoidable accident, or the act of God, a railroad company, where the crew of a train which was derailed remained on duty for more than 16 consecutive hours, is not liable to the penalty of the act, for, while the term "casualty" does not include ordinary accidents incidental to railroading, a derailment is not incident to good railroading, and in such case, for the protection of other employés and passengers, the crew in

charge of a derailed train may be required to remain on duty for more than 16 hours.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

For other definitions, see Words and Phrases, First and Second Series, Casualty.]

4. MASTER AND SERVANT ☞13—HOURS OF SERVICE—DEFENSES.

Where, without ascertaining when tracks would be cleared, trains were dispatched over tracks on which it was known there had been a wreck, so that the crews of such train were kept on duty for more than 16 consecutive hours, the fact of the wreck furnishes no defense to a prosecution for the violation of the Hours of Service Act; it being the duty of the railroad company's servants to ascertain such facts before dispatching trains.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

5. MASTER AND SERVANT ☞13—HOURS OF SERVICE—DEFENSES.

Where the watchman at an intermediate point, where a train was required to lay over, refused to watch the engine, claiming that he was afraid of the injector, and the fireman, who volunteered to watch the engine, was on duty more than 16 hours, the watchman's unforeseen insubordination was a casualty, excusing the railroad company from any violation of the Hours of Service Act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

In Error to the District Court of the United States for the District of Utah; John A. Marshall, Judge.

The Denver & Rio Grande Railroad Company was convicted of several violations of the Hours of Service Act, and acquitted as to other violations, and both it and the United States bring error. Reversed on defendant's writ as to some of the counts, and otherwise affirmed.

Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C. (William W. Ray, U. S. Atty., of Salt Lake City, Utah, on the brief), for the United States.

Russell G. Lucas, of Denver, Colo. (Waldemar Van Cott, E. M. Allison, Jr., and William D. Riter, all of Salt Lake City, Utah, on the brief), for defendant.

Before CARLAND, Circuit Judge, and VAN VALKENBURGH and AMIDON, District Judges.

AMIDON, District Judge. This case involves section 3 of the Hours of Service Act (34 Statutes at Large, 1415 [Comp. St. 1913, § 8679]). The complaint charges in separate counts, a large number of violations, and demands the penalty fixed by the law. The case was submitted on an agreed statement of facts. Upon this the court directed a verdict in favor of the plaintiff as to all counts embraced in this writ of error, except 18. As to that it directed a verdict in favor of the company. Both parties bring error, the government as to count 18, and the company as to the others.

[1] Counts 1 to 5 charge the employment of a crew of five men overtime on a run from Salt Lake City to Park City, Utah, and re-

turn, a distance of 33 miles. Soon after the train left Salt Lake City it was derailed. The conductor in charge communicated with the train dispatcher by telephone, advising him of the derailment, and stating that the crew could accomplish nothing further until the arrival of a derrick. The crew thereupon cut the engine loose and proceeded about a mile and a half from the point of derailment to a farmhouse where they left it in charge of a watchman. They were told by the dispatcher that a derrick to be sent from Salt Lake City would be at the derailment about 1 p. m. From the farmhouse the smoke of the approaching derrick would be visible. They partook of a luncheon and rested under the shade of some trees at the farmhouse until the approach of the derrick, whereupon they returned to the scene of the derailment. The crew was not released by any officer or agent of the company empowered to release them during the time they were at the farmhouse. If this period is deducted, there would be no violation of the law. Counsel for the company urge that the crew "released themselves." This we think they could not do. They were on duty, as between themselves and the company, during the entire period. A release, so as to justify a deduction of time, under the statute, can only be given by some officer or agent having authority to give it. The men, therefore, remained on duty for more than 16 hours.

[2] No extra crews were kept at Park City, nor was there any occasion to keep them. The journey from Salt Lake City and return was usually made well within the 16-hour period. If the crew had been released from the train at Park City, the company had no person there competent to take charge of the train or the engine. We are therefore of the opinion that the round trip must be treated as a continuous journey, and Park City simply as a way station.

[3] This brings us to the question whether the derailment was such a "casualty" as to place the company within the protection of the proviso of section 3 of the Hours of Service Act. The stipulation is silent as to the cause of the derailment. There is nothing to show whether it was due to the negligence of the company or its employés, or was an unavoidable accident. Counsel for the government urges that it was incumbent upon the company, in order to bring itself within the proviso, to show that the derailment was not due to its negligence or the negligence of its employés. The trial court adopted that theory. We think this was error.

A carrier must use diligence to anticipate, as this court held in United States v. Kansas City Southern Railway Co., 202 Fed. 828, 121 C. C. A. 136, "all the usual causes incidental to operation." And when any casualty occurs the carrier must still use diligence to avoid keeping its employés on duty overtime. Failure to perform either of those duties deprives it of the benefit of the proviso. Poor coal, meeting of trains, switching, defective shaker rod, leaky flues (United States v. Kansas City Southern Ry. Co., 202 Fed. 829, 121 C. C. A. 136), pulled out drawbar, bursted air hose (United States v. Great Northern Railway Co., 220 Fed. 630, 136 C. C. A. 238), extraordinary head wind, heavy grain movement, hot box (Great Northern Railway Co. v. United States, 218 Fed. 302, 134 C. C. A. 98, L. R. A. 1915D, 408), high wind, broken tail pin, hot box (United States v. Lehigh

Valley Railroad Co., 219 Fed. 532, 135 C. C. A. 282), have been held to be causes of delay "incidental to operation." We stated generally in United States v. Kansas City Southern Railway Co., 202 Fed. 828, 121 C. C. A. 136, that:

"It has been uniformly held by the courts that ordinarily delays in starting trains by reason of the fact that another train is late; from side-tracking to give superior trains the right of way, if the meeting of such trains could have been anticipated at the time of leaving the starting point; from getting out of steam or cleaning fires; from defects in equipment; from switching; from time taken for meals; and in short from all the usual causes incidental to operation—are not, standing alone, valid excuses within the meaning of this proviso."

As to such causes of delay we said:

"The carrier must go still further and show that such delays could not have been foreseen and prevented by exercise of the high degree of diligence demanded."

The casualty here is not of the character mentioned in any of the cases above referred to. It was a derailment. That is an event which is not to be anticipated in good railroading. A history of the statute will show that accidents which are of a character to seriously interrupt traffic, and suspend for a considerable time the operation of trains, come within the proviso. As the statute was originally drafted, it simply provided that the carrier should not require or permit any employé to remain on duty more than 16 consecutive hours, "except when by casualty occurring after such employé has started on his trip, or by unknown casualty occurring after such employé has started on his trip, he is prevented from reaching his terminal." The report of the committee having the bill in charge, and the debate in the Senate, disclose that the statute was drafted by counsel representing the Brotherhoods of Railroad Trainmen, and it was thought by them that the word "casualty" alone expressed precisely the meaning intended; that is, an unforeseen accident. Certain Senators pointed out that the term "casualty" was not a legal term, and they were not sure that it would embrace unavoidable accidents and acts of God. While the bill was pending in the Senate these words were added, not for the purpose of reducing the meaning of the term "casualty," but to make certain that the carrier would have the protection of acts of God and unavoidable accidents. At that time the statute did not contain the clause in regard to telegraph operators. When that was added by the House committee, the exception could not be conveniently embodied in section 2, and for that reason was carried forward and attached as a proviso to section 3.

We do not think it was the intent of Congress in case of such serious matters as derailments and collisions to take from the company the protection of the proviso even if such events were caused by the negligence of the company or its employés. On the other hand, it was the intent of the statute in case of such an event to leave the company free to deal with the situation and to retain employés in the service if that result could not be avoided by the exercise of reasonable diligence after the occurrence of the accident. As was pointed out by this court in United States v. Missouri Pacific Ry. Co., 213

Fed. 169, 130 C. C. A. 5, in case of such an accident the first duty of the company is to protect the traveling public and other employés, and if keeping employés on duty overtime is necessary in order to meet the situation the carrier is permitted to do so under the proviso. In the presence of such an event the law does not look to the question how it was brought about; on the other hand, it is chiefly concerned with the protection of those whose lives may be imperiled. The penalties prescribed in the statute are not a punishment for negligence, but for keeping men on duty for excessive periods. The statute clearly recognizes that there may be emergencies justifying such longer period of service. Not to permit it would imperil the traveling public and other employés of the carrier. "The usual causes incidental to operation" do not come within this class, for the reason that they can usually be anticipated, or their consequences avoided, by the exercise of diligence after they occur.

We are of the opinion, therefore, that the derailment involved in these counts brought the company within the scope of the proviso. This would be true, whether it was caused by negligence or was a pure accident. The stipulation of facts clearly shows that the keeping of the men on duty for the excessive time was caused wholly by the derailment, and could not have been avoided by the exercise of diligence on the part of the company after the derailment occurred. We are of the opinion, therefore, that the trial court erred in directing a verdict in favor of the government as to these counts, and its judgment must be reversed.

[4] Counts 6 to 10 involve the crew in charge of a train from Helper to Salt Lake City, a distance of 114 miles. Before this trip was entered upon, an accident had occurred to another train, involving the derailment of 14 cars. Defendant's train dispatcher knew of this accident before the train here involved left Helper, and directed it not to leave that point until further orders. At about that time he received telephonic advice from the conductor of the wrecked train that the track would be cleared for traffic within 20 or 30 minutes after the arrival of a derrick. A derrick was sent forthwith from Helper, arriving at the scene of the derailment about 7 a. m. The train dispatcher, relying on the advice given him as to the time it would take to clear the track, ordered the train in question to leave Helper for Salt Lake City at 6:30 in the morning. He did this without waiting to see what time would be necessary to clear away the wreck. Much more time was in fact consumed than was anticipated, and when the train approached the point where the wreck occurred, it was detained, and this caused the keeping of the crew on duty for a longer period than 16 hours. The point at which the derailment occurred was only 6 or 7 miles from Helper, and telephonic communication existed between the points. No reason is shown why the train was ordered to leave this terminal before the derrick had actually arrived at the scene of the wreck and some progress had been made in removing it. There was no excuse for acting on first impressions as to the time that the line would be obstructed. In our judgment, therefore, the trial court was right in directing a verdict in favor of the plaintiff as to these counts.

Counts 11 to 15 involve a crew of five men in charge of a train running from Colton to Salt Lake City, Utah, a distance of 96 miles. Before the train in question left Colton another train had been derailed at a point 43 miles distant towards Salt Lake City. The conductor in charge of the derailed train notified the train dispatcher by telephone of the derailment, and expressed the opinion that the wreck could be cleared within 1 hour after the arrival of the derrick. The superintendent went promptly with the derrick to the scene of the wreck, where he was in easy communication with the train dispatcher by telephone. That officer, however, did not wait for advice from him, but ordered the train here involved to leave its terminal on the hasty opinion of the conductor of the wrecked train as to the time that would be necessary to clear the wreck. This, instead of taking 1 hour, took 6. The train here involved was stalled for 3 hours and 30 minutes waiting for the wreck to be cleared. It then proceeded, but when it reached its terminal at Salt Lake City the crew had been on duty for 17 hours and 15 minutes. Upon these facts the trial court was clearly justified in holding that the overtime service was due, not to the derailment, but to the ordering of the train out of its terminal before the wreck was cleared up. After the derrick reached the wreck there was ample time and opportunity to learn the actual situation. The train dispatcher should have waited for trustworthy information. The duty of the carrier to comply with this beneficent statute must be placed above its zeal to hasten transportation.

Counts 16 and 17 involve the engineer and fireman of two passenger trains which were delayed by the wreck above described in connection with counts 11 to 15. These trains were ordered out of their terminals on the statement of the conductor that the wreck could be cleared in 1 hour, and were delayed because that operation required in fact 6 hours. For the reasons stated in connection with the other counts, the trial court correctly ruled that the government was entitled to judgment upon these counts.

[5] Count 18 involves an employé on a train from Thistle to Richfield, Utah. It started on its journey at 7:30 a. m., and reached an intermediate point, Manti, at 11:29 p. m. It had then been discovered that the train could not complete its trip without retaining its crew overtime, and it was ordered to lay up at Manti. A coalheaver at that point, employed by the company as an engine watchman, was expected to take charge of the engine. When asked to do so, however, he refused, for the alleged reason that he feared the engine might blow up, as he had previously had some difficulty in operating its injector. The trainmen endeavored to arrange for somebody else to take charge of the engine without avail. Finally the fireman volunteered to meet the emergency and remained on duty until 7 o'clock the following morning, when he was released, having been on duty as fireman and as engine watchman continuously for 23 hours and 30 minutes. It is conceded that the injector was in fact not defective, and there was no justification for the refusal of the watchman to take charge of the engine. We think the trial court properly held that the unforeseen insubordination of this employé was a casualty within the meaning of the statute. In United States v. Denver & Rio Grande

Ry. Co., 220 Fed. 293, 136 C. C. A. 275, we held that insubordination of an employé may constitute an "emergency," within the meaning of section 2 of the statute, justifying the retention of a telegraph operator overtime. No sound reason can be given why similar insubordination does not constitute a "casualty," within the proviso of section 3.

The order in this case will be that the judgment of the trial court as to counts 1 to 5, inclusive, be reversed, and a new trial granted.

As to the other counts here under review, the judgment of the trial court will be affirmed. Neither party will recover costs.