BROWN *v.* PERE MARQUETTE RAILWAY CO.

MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—HOURS OF SERVICE ACT—RAILROADS—PERSONAL INJURIES.

Under the hours of service act (34 U. S. Stat. p. 1416 *et seq.*), a brakeman who had been on duty for 16 consecutive hours terminating at 7 o'clock in the morning, who then went off duty according to the report of his conductor, and went to sleep in the caboose of the train, which was unable to proceed because of a defective engine, was not in the employment of the railroad company at the time of his injury, an hour and 50 minutes later, so as to render the company liable under the Federal employers' liability act, although the relief crew, ordered to bring in the train, had not yet arrived to take charge thereof when the injury occurred, nor had he been relieved by any order from the superintendent or train dispatcher. BIRD, J., dissenting.

Commerce, 12 C. J. § 55; Master and Servant, 39 C. J. § 399; 15 L. R. A. (N. S.) 134; 29 L. R. A. (N. S.) 240; 52 L. R. A. (N. S.) 267; 16 R. C. L. 492; 3 R. C. L. Supp. 581; 4 R. C. L. Supp. 1063.

Error to Saginaw; Browne (Clarence M.), J.   Submitted April 22, 1926.   (Docket No. 113.)   Decided April 1, 1927.

Case by Charles Erwin Brown against the Pere Marquette Railway Company for personal injuries. Judgment for plaintiff.   Defendant brings error. Reversed, and judgment ordered entered for defendant.

*W. K. Williams* and *John C. Shields* (*Weadock & Weadock,* of counsel), for appellant.

*Crane & Crane* (*R. L. Crane* and *W. J. Nash,* of counsel), for appellee.

SHARPE, C. J.   Defendant reviews by writ of error a judgment recovered by plaintiff under the Federal employers' liability act for damages for injuries sustained by him in a collision between two trains on the defendant road.   An extra freight train (No. 1114) left Saginaw at 3 p. m. on January 12, 1923, for Toledo in the State of Ohio.   The crew consisted of Engineer Salow, Fireman Yerebeck, Conductor Elliott, rear Brakeman Fredericks, and plaintiff as head brakeman.   It reached Plymouth, a distance of 82 miles from Saginaw, at 12:10 a. m. without incident.   It took on some coal there and left at 1:50.   It then consisted of 78 cars.   The night was cold.   Soon after leaving Plymouth, engine trouble developed, due in part to the coal which was taken on there and to leaks in the flues of the boiler.   Occasional stops between stations were made to get up sufficient steam to move the train.   It stopped for water at Monroe, and with occasional stops passed through Erie and reached Alexis Booth, a flag station three miles out of the Toledo yards.   The plaintiff, who was riding on the engine, had assisted the engineer and fireman in their

efforts to keep up steam.    As the train was pulling into Alexis Booth, he alighted from the engine and went into the way car.    It then lacked but a few minutes of 7 o'clock, at which time the crew would have completed 16 hours of continuous service.    The train was stopped by shutting the throttle and applying the brakes.    As plaintiff alighted, he spoke to the engineer about informing the dispatcher of their whereabouts and what had occurred, and said that their time was up at 7 o'clock.    There was a side track on which the train could have been placed.    No effort was made to do so.    The engineer testified:

"Q. You did not try to back in, as a matter of fact?
"A. I did not have time to back in.
"Q. You mean by that, Mr. Salow, on account of your 16 hours expiring you did not have time to back in?
"A. That way I understood the law, yes.
"Q. If you had continued on, notwithstanding this 16-hour law, you could have backed the engine in?
"A. Yes."

The plaintiff testified that the train could have been placed on the passing track, but that the 16 hours of continuous service would have been exceeded in that work.    Just before stopping, the engineer blew the whistle to advise the conductor and rear brakeman that a flag should be put out to protect the rear of the train.    In the nighttime, torpedoes are placed on the track to take the place of a flag.    The engineer went to a telephone box, near which the engine had stopped, called the dispatcher at Saginaw, and informed him that they were at Alexis Booth; that "Our time is up at 7 o'clock, and the engine is in very bad condition;" that he heard the dispatcher call Ottawa yards and say that "Extra 1114 was at Alexis, time up at 7 a. m., and must have help to get in;" and that he was advised that a relief engine and crew would be sent from the Toledo yards to take the train in.    That

the train was on the main track was not mentioned.

Plaintiff testified that his intention when he left the engine was to take advantage of the rest period provided for by the statute hereafter referred to.    As soon as he entered the caboose, he took the bedding which the train men themselves provided, made up a bed, lay down and went to 'sleep.    The rear brakeman and conductor did likewise.    Before doing so, the conductor filled out and signed his daily report, which showed that he and the two brakemen went off duty at 7 a. m., and that they had been working for 16 hours.    The plaintiff testified that when he entered the caboose he asked the rear brakeman if he had put out the signals and was informed that he had.

At 7:10 that morning defendant's fast express left Detroit for Toledo.    At 8:56 it collided with the rear end of the freight train.    The rear brakeman on the freight train and a student fireman on the express were killed, and plaintiff and the conductor were injured.

Plaintiff's action is brought under what is known as the Federal employers' liability act (35 U. S. Stat. p. 65 *et seq.*).    Right of recovery thereunder is limited to employees engaged in interstate commerce and to one "suffering injury while he is employed by such carrier in such commerce," etc.    It is conceded that plaintiff was engaged in interstate commerce while assisting in the movement of the train from Saginaw to Alexis Booth.    The serious question here presented is whether he was in the employment of the defendant at the time he was injured.    It was raised by defendant by a motion to direct a verdict in its favor when the proofs were closed, which was taken under advisement by the court.    On renewal after verdict, the motion was denied.

The Federal statute (34 U. S. Stat. p. 1416 *et seq.*), commonly spoken of as the "hours of service act," is

so readily accessible that we refrain from quoting it in full.    It provides that—

"it shall be unlawful for any common carrier   *   *   * to require or permit any employee subject to this act to be or remain on duty for a longer period than sixteen consecutive hours;"

that he then must be relieved and not—

"permitted again to go on duty until he has had at least ten consecutive hours off duty."

The act contains a proviso, reading as follows:

"*Provided,* That the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen."

Carriers violating the act are liable to a penalty of not less than $100 nor more than $500, to be recovered in a suit brought in the district court of the United States.

It is defendant's claim that plaintiff's employment ceased when he left the locomotive and went to the caboose and made up his bed and went to sleep thereon; in other words, that he had quit work, and, without violating the law, the defendant could not have required him to perform service or even permitted him to do so until the 10 hours of rest to which he was entitled had expired.

Plaintiff's counsel insist that until the train crew was relieved by another crew arriving and taking charge of the train they were still on duty and in the employ of the defendant.

In 2 Roberts' Federal Liability of Carriers, § 892 *et seq.,* the purpose, scope, validity and interpretation of the hours of service act are discussed and the Federal cases construing and applying it are cited, and

many of them are quoted from and commented upon. This chapter may be read with profit. The purpose of the act is to promote the safety of interstate commerce; to protect the lives of railroad employees and the lives and property intrusted to railroads as carriers. The employees are not penalized if they work overtime. In *San Pedro, etc., R. Co.* v. *United States,* 213 Fed. 326, 130 C. C. A. 28, it was said:

"It was thought futile to attempt to control the employees in their use of their off time; therefore, as being more practical and efficient, the command was laid upon and confined to those who gave them employment in their regular occupations."

The prohibition against requiring, or even permitting, employees to remain on duty for a longer period than 16 consecutive hours has been applied with considerable strictness in actions brought in the Federal courts for the recovery of the penalty. The courts have held that the law means just what it says, that employees within its provisions must have at least 10 continuous hours of rest afforded them after having worked for 16 hours. The work period begins when employees, acting under orders, report for duty, and the carrier is bound to relieve them when they have been on duty for 16 hours, unless excess service be required because of the unforeseen casualties provided for in the act. In the event of such a casualty, they must be relieved if the train is at a place where such relief is possible. Should it occur between stations, they may continue in service until relieved by another crew, or, if possible, they may take their train into the next station on their run.

Rule 99 of the defendant provides:

"When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection, and place one torpedo upon the rail on the engineman's side

of an approaching train.   When recalled, he must place an additional torpedo not more than 200 feet from the first one and at night or in fog or severe storm place one lighted red fusee outside the rail on engineman's side before returning to his train.

"The front of a train must be protected in the same way by the head brakeman, or, when necessary, by the fireman."

The plaintiff alighted from the engine and went to the way car because his 16 hours of continuous service had expired.    If still on duty, he should have remained on the engine or protected it as provided for in the rule.    It is certain that he was performing no actual service for his employer when he lay asleep in his bed.    To use a common expression, "he had quit work" and was not called upon to perform any other service until the collision occurred.    Whatever duty may have rested on the engineer or fireman to look after their engine until the relief crew arrived, it is clear that none rested on the conductor or brakemen. They had no duty to perform; there was nothing that they could do in the service of the defendant.    Nor would they have been called upon to do anything on the arrival of the relief crew.    The conductor had made out and signed his daily trip sheet, and had left it in the usual place in the caboose, to be taken by the conductor of the relief crew.    In it he stated that he and the brakeman had gone "off duty" at 7 a. m., and that the train was "tied up at Alexis."    His work and that of the brakemen, so far as the further movement of the train was concerned, was at an end when they lay down to sleep.    They expected, and had a right to expect, that their train would be pulled into the yards by another engine, in charge of another train crew.    Had not the collision occurred, they would have ridden in in the way car in which they were sleeping.    In railroad parlance, this is called "deadheading."    They would not have been required

to perform, nor would they have been held responsible for the performance, of any service or duty while so riding, and would not have been "on duty" during that time. *Osborne's Adm'r* v. *Railway Co.,* 158 Ky. 176 (164 S. W. 818, Ann. Cas. 1915D, 449).

On July 9, 1919, the superintendent of the division on which this train was running had sent a "general notice" to "all concerned," stating:

"All employees who come under the hours of service law must not exceed their hours of service except only on written instructions signed by the superintendent."

It is apparent that these employees construed this notice literally. When the train reached Alexis Booth, and their 16 hours of continuous service had expired, they quit work. The daily report made by the engineer stated that the train was "tied up at Alexis on account of 16 hrs." Had the engineer and conductor not so concluded, it seems certain that they would have placed the train on a side track.

The cases in the Federal courts involved prosecutions of the carriers for violating the law in requiring or permitting the employees to work longer than 16 hours. In those cases, the carriers were insisting that certain services were not within the act, or that there had been intervening hours of rest, or that a casualty relieved them from the operation of the law under the proviso in the act. The courts, after stating the purpose of the act, declined to permit any excuse for its violation not fairly within its terms.

The words "on duty" used in the statute very clearly express the legislative intent. An employee may be inactive, and yet on duty. He is on duty if at his post and ready and willing to work, though he may be but awaiting orders or the removal of hindrances which prevent him from performing his duties. *Denver, etc., R. Co.* v. *United States,* 233 Fed. 62, 147 C. C. A. 132.

In *Great Northern R. Co.* v. *United States,* 211 Fed. 309, 127 C. C. A. 595, a freight train was run into a siding, the 16-hour period of service having elapsed. The train crew other than the fireman retired to rest in the caboose. The fireman remained on the engine to keep up steam. Permitting him to perform this work, after he had been on duty as a fireman for 16 hours, was held to be a violation of the statute. No claim, however, was made that the employees at rest in the caboose were on duty.

It is urged that the plaintiff was not relieved by any order from the superintendent or train dispatcher. But a man does not have to receive an order to quit work when his hours of daily service have expired. The plaintiff knew this. He did not inquire of the conductor, his superior in the operation of the train, whether any further or other service was required of him. He treated the statute and the notice of the superintendent as a command, and in obedience thereto he left the engine, where his duty, if at work, required him to remain, and went to the caboose and made up his bed and lay down upon it and went to sleep. In our opinion he was not on duty at the time the collision occurred, and the defendant's motion for a directed verdict should have been granted.

The judgment entered is reversed and set aside and the cause remanded, with directions to the trial court to enter a judgment for defendant on its motion *non obstante veredicto,* with costs of both courts to defendant.

STEERE, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred with SHARPE, C. J. SNOW, J., did not sit.

BIRD, J. (*dissenting*). I am not in accord with the holding that plaintiff cannot recover because he was not on duty at the moment he was injured. I think he was on duty for two reasons:

1. He was still on duty in pursuance of an exception to the 16-hour law, which reads as follows:

"*Provided,* That the provisions of this act shall not apply  *  *  *  where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal and which could not have been foreseen."   34 U. S. Stat. p. 1416, § 3.

The locomotive had been inspected before leaving Saginaw.   It was reported in good working condition.   And no trouble was experienced until the train arrived at Plymouth.   After leaving that point it was difficult to keep up steam.   Several stops were made to get up steam.   Leaky flues and poor coal were the causes assigned by the fireman.   At Alexis the locomotive was practically dead, and the dispatcher was notified of the fact, and of the further fact that the 16 hours were up, and he at once ordered a switch engine from the Ottawa yards, three miles away, to come to their relief.   At the time the 16 hours expired the men were still on duty, if the exception created applies.   It is obvious that the carrier had no knowledge when the locomotive left Saginaw that she was liable to fail before she arrived at Ottawa yards.   The defect, if it existed, was not discovered by the inspectors.   It appears to have been a new break or defect, due, in some measure, to the severity of the weather.   The leaky flues and poor coal caused a diminution of power.   It, therefore, seems to me that the facts bring it directly within the exception to the 16-hour law.   The facts were in conflict on this question and it was submitted to the jury.   If their conclusion be right the men were still on duty when the accident occurred, and until they reached the terminal.

2. If, by any course of reasoning, it can be shown that the facts did not bring the case within the exception, I am still of the opinion that the men were

on duty when the accident occurred.    When they ar-
rived at Alexis the 16 hours of service had expired.
They were bound to go no further, but they were
bound, by the rules, to stay with their train until they
got it in the clear, or were relieved by another crew.
They could not get it in the clear without great dif-
ficulty because they had 78 cars, and the side track
would not hold them, and beside this they had no
locomotive to pull them in.    The testimony of the
engineer as to what vitality the locomotive had is
persuasive:

"*Q.* When you were at Alexis could you have pulled
your train from that point down to the siding on the
south track to the south, and backed in, and taking
your engine to handle the load, just as you were at that
point, to handle—and you actually knew the facts?
    "*A.* Not by just cleaning the fire, not (without)
having some work done on the engine.    The engine
was practically useless.    That was the only engine on
the train.    Brown said to me, as he left the engine
and went to the rear of the train prior to stopping at
Alexis, that our time will be up.    He asked me if I
would call him and I said I would.
    "*Q.* Call up whom?
    "*A.* The dispatcher.    He said there would be no
use of my riding up there, and wanted to know if I
would call him up, which I said I would.    That is
practically all the conversation that we had at the
time that Brown got off.    Brown had been riding on
the engine and he knew the conditions of the engine
the same as I did.    The engine couldn't be used for
nothing else; she was practically dead."

The trainmen undoubtedly thought that before they
could get up steam to get the train on the side track
the relief crew would be there, as they were expecting
a yard engine to arrive very soon.    The plaintiff or
head brakeman had no further duties up at the head
of his train because the road was blocked at that end.
If a train went north it would go on the other track,
it being a double-track road at that point.    He went

back to the caboose and lay down after being assured by the rear brakeman that he had put out signals in the rear.    They waited an unusual time for the arrival of the yard engine and crew.    Before they arrived the accident occurred.    Whether plaintiff was wise in lying down before the relief crew came is another question, and probably one for the jury.

To say that the trainmen that morning had a right, at the expiration of 16 hours, to pick up their clothing and take an automobile for Toledo before their train was in the clear, or before they were relieved by another engine and crew, would be to place a construction on the 16-hour law which was never intended.    Such a construction is not a practical one.    The American railroad could not be operated without great difficulty if such a construction be placed on the rule.    While the hours of service had expired, the trainmen were bound by the rules to remain with it until it was safely on the siding or they were relieved by another crew.    Any other construction than this would make the operation of railroads a hopeless task.

If plaintiff had the right to leave his train upon the expiration of 16 hours, all the trainmen could leave. The same rule applies to all trainmen.    Had this course been followed, this train of 78 cars, a locomotive and caboose would have been left on the main track unattended.    Such a construction is not a reasonable one, as it would result in destruction of property and would endanger the lives of employees and passengers.

The Federal court in discussing when an employee of a railway was on duty said:

"But it is said by defendant that, however this may be, there was no consecutive service of 16 hours because of the lay-out of 55 minutes at Osier.    This latter, as we have seen, was in order that east-bound train No. 442 might pass.    The record shows that the hour of arrival of this latter was uncertain except that it seems to have been momentarily expected.    It might come in a few minutes, or it might not arrive in an

hour.  Pending its arrival, the train here involved was rendered safe by being put into a siding and the switch locked.   As a matter presumably of economy the headlight was extinguished.   All this done, the crew retired to the caboose, the brakemen to utilize the uncertain interval in a nap, the conductor in reading. There was, however, no release of the crew by the train dispatcher, and their pay covered the time they were held at Osier.   It is said that, upon this state of facts, the crew ceased to be on duty during the wait upon the siding.   This, however, is clearly untenable.   True, as the conductor in effect testified, they ceased to be responsible during this period for the operation of the train, for it was not in motion.   It is evident, however, that they became, instead, intrusted with its custody.   It was further their duty to know immediately of the arrival of No. 442, whether this occurred in 10 minutes or in 55, and immediately upon such arrival they were charged with the responsibility of relighting the headlight, leaving the siding, and proceeding to destination.   As long ago as Milton it was said:   'They also serve who only stand and wait.' It detracts nothing from this great truth as applied to the present situation that the tired crew at this hour of the night utilized the wait in sleep or in a book.   They were there on pay; they were there in charge of the train; they were there subject to active duty as soon as No. 442 whistled for the station." *United States* v. *Railway Co.*, 197 Fed. 629.

See, also, *Missouri, etc., R. Co.* v. *Central States*, 231 U. S. 112 (34 Sup. Ct. 26).

The defendant claims that plaintiff abandoned his work and was, therefore, off duty.   His present work was performed.   He had to wait until the relief crew came. ·   If the engine came without a crew he would be obliged to assist in getting the train into the terminal.   In the interim what difference did it make what he did—whether he dozed or cooked his breakfast?   He testified he was ready to do whatever he was called upon to do to get the train into the terminal.   The defendant drew a different inference from his acts.   The trial court submitted the question

to the jury.    It certainly was not a question of law. The trial court also submitted the question as to whether plaintiff was engaged in interstate commerce when injured.    The jury made a finding and that is final if the case was properly submitted.    The disputed questions were well taken care of in the court's charge, and I think the judgment should be affirmed, with costs of both courts to plaintiff.