UNITED STATES v. KANSAS CITY SOUTHERN RY. CO.

(Circuit Court of Appeals, Eighth Circuit. January 24, 1913. Rehearing Denied March 29, 1913.)

1. MASTER AND SERVANT (§ 17*)—EMPLOYMENT—REGULATION—INTERSTATE COMMERCE—HOURS OF SERVICE LAW—BURDEN OF PROOF—PRIMA FACIE CASE.

In an action by the United States against an interstate carrier for violating the Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]), the burden is on the government to establish that defendant had required or permitted its employés to remain on duty longer than 16 hours, and this, being conceded, made a prima facie case.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

2. MASTER AND SERVANT (§ 17*)—EMPLOYMENT—REGULATION—HOURS OF SERVICE LAW—DEFENSES—PLEADING.

Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]) prohibits an interstate carrier from requiring or permitting employés to remain on duty longer than 16 consecutive hours, but provides that the act shall not apply in case of casualty or unavoidable accident or the act of God, nor where the delay was the result of a cause not known to the carrier, or· officer or agent in charge of the employé at the time when the employé left the terminal, and which could not have been foreseen. *Held*, that the ex-

cuses embodied in the proviso are separate and affirmative defenses which must be specially pleaded and established by the carrier.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

3. MASTER AND SERVANT (§ 17*)—HOURS OF SERVICE LAW—VIOLATION—PLEADING.

In an action for violating the Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]), evidence in support of a defense that the delay was caused in part by a broken shaker rod and leaky flues of the engine would be considered, though not pleaded, where it appeared that by common consent of court and counsel the case was tried as though such alleged defects were embraced within the issues.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

4. MASTER AND SERVANT (§ 13*)—INTERSTATE CARRIERS—HOURS OF SERVICE LAW—CONSTRUCTION.

The Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]), limiting the employment of servants engaged in interstate commerce to 16 hours, being highly remedial, should be liberally construed, though it is penal in the sense that a penalty is provided for its violation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

5. MASTER AND SERVANT (§ 13*)—EMPLOYMENT—REGULATION—HOURS OF SERVICE LAW—CONSTRUCTION.

Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]) limits the employment of operatives engaged in interstate commerce by a carrier to 16 hours, but provides that the act shall not apply in case the delay is the result of a cause not known ·to the carrier at the time the employé left the terminal or one which could not have been foreseen. *Held*, that the act did not imply that what was not actually foreknown could not, in contemplation of law, have been foreseen, the carrier being held to as high a degree of diligence and foresight as is consistent with the object of the act and the practical operation of the railroad; and hence all the usual causes of delay incident to operation are not, standing alone, valid excuses, but the carrier must further show that such delays could not have been foreseen and prevented by the exercise of the high degree of diligence demanded.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

6. MASTER AND SERVANT (§ 17*)—CONTRACT OF EMPLOYMENT—REGULATION—HOURS OF SERVICE LAW—OPERATION OF TRAINS—DELAY—DEFENSE—QUESTION FOR JURY.

In an action by the government against an interstate carrier for violating the Hours of Service Law (Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 [U. S. Comp. St. Supp. 1911, pp. 1321, 1322]), defendant claimed that the delay was the result of a cause not known at the time the employé left a terminal, and that it could not have been foreseen, specifying that it resulted from the poor steaming qualities of the coal, leaky flues of the engine, and defective shaker rod. There was no proof of any defect in the coal, which was the same kind that the company had been using for years, and which had been duly inspected. The flues leaked, but when the leaking began was not shown. It was proved, however, that the engine had been twice reported by the engineer for repairs, together with two reports on the same day, but following distinct trips, that the shaker rod was defective and should be repaired. It also appeared

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that throughout the trip at least as far as B. the train dispatcher was aware of the progress of the train, at which station the conductor, by lightening his train a little more than half, assumed that he could reach the division 14 miles away in less than an hour, but, by reason of the defective condition of the engine, was unable to do so, using an hour and 45 minutes to cover the distance. *Held*, that such facts did not show, as a matter of law, that the delay was the result of a cause not known to the carrier before the employé left the terminal and which could not have been foreseen.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

In Error to the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Action by the United States against the Kansas City Southern Railway Company for violation of the Hours of Service Law. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

William J. Gregg, U. S. Atty., of Muskogee, Okl., and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C.

James B. McDonough, of Ft. Smith, Ark. (S. W. Moore, of Kansas City, Mo., on the brief), for defendant in error.

Before HOOK and SMITH, Circuit Judges, and VAN VALKEN-BURGH, District Judge.

VAN VALKENBURGH, District Judge. This suit was brought against the Kansas City Southern Railway Company to recover penalties for violation of the act of Congress of March 4, 1907, known as the "Hours of Service Law." Chapter 2939, 34 Stat. 1415, 1416 (U. S. Comp. St. Supp. 1911, pp. 1321, 1322). The complaint is in five counts, in each of which the maximum penalty of $500 is prayed. In these several counts it is charged that five employés of defendant, a conductor, engineer, fireman, and two trainmen, were required and permitted to remain on duty for a period of 17 hours and 5 minutes, or 1 hour and 5 minutes in excess of the maximum of 16 hours provided by law. These violations are alleged to have been committed in connection with the running of one of defendant's freight trains between Mena, Ark., and Stilwell, Okl., on May 10 and 11, 1910. At the trial the following admission was made by defendant:

"It is admitted there was an hour and 35 minutes overtime for the engineer and fireman; the others were a few minutes less, but we admit they were in the employ over 16 hours, as claimed by the government."

By its answer, as amended, defendant pleaded that the admitted delays were occasioned principally by coal that would not steam properly, although alleged to have been procured from mines producing good steaming coal, and to have been inspected before purchase. Additional causes of delay pleaded were the meeting of other of defendant's trains, switching, and cleaning fires. It is alleged that these causes were unknown and could not have been foreseen by the defendant, its officers, agents, or employés, at the time the train left the Mena terminal. Although the answer contained no such averments, evidence

was admitted tending to show that a shaker rod connected with the grates of the engine, whereby these grates can be cleaned while the train is in motion, did not work properly, and that this made it necessary to clean the grates with a rod while the train was stationary; also, that the flues of the engine leaked, which caused a failure of steam.

It being conceded that the employés named had remained on duty for a longer period than 16 consecutive hours, substantially as charged, the defendant railway assumed the burden of discharging itself from liability therefor by seeking to bring itself within the following provision of the act:

"Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident, or the act of God, nor where the delay was the result of a cause not known to the carrier, or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen."

The train in question left Mena 45 minutes later than its stated time; it reached Poteau still behind time, and there took on coal and water; it next proceeded to Spiro, where 30 minutes were consumed in cleaning the fire grates, and 35 minutes more in meeting other trains; at Gans, the next station specified, an hour was lost in meeting train No. 51; between Sallisaw and Windsor an hour and 10 minutes were lost because of the alleged failure of the engine to steam properly; at Windsor there was a delay of 50 minutes occasioned by meeting two other trains; the distance from Sallisaw to Bunch is 19 miles, and the time consumed in making this distance, exclusive of the 50 minutes lost at the intermediate station of Windsor, was 3 hours and 10 minutes. This slow time is charged principally to engine failure. From Bunch to Stilwell, the terminal, the distance is 14 miles; there then remained 57 minutes within which to make this distance within the 16-hour limit. The conductor, acting upon his own initiative, or the direction of the train dispatcher, reduced his tonnage by a little more than one-half and proceeded with the remaining cars to Stilwell. Because of further alleged engine failures an hour and 45 minutes were consumed in making this distance, and 30 minutes more elapsed before the crew were released. The following additional delays were encountered in the earlier stages of the trip: Twenty-five minutes for meeting an extra train; at Poteau, 30 minutes for weighing cars of lumber, 30 minutes for luncheon, and 20 minutes for taking on coal and water; at Panama, 15 minutes for switching and setting out cars. It is conceded that these additional delays were usual to operation and that defendant is entitled to no time credit therefor. It is claimed, however, that the 30 minutes consumed in cleaning fires at Spiro was due to the broken or bent condition of the shaker rod, which prevented the grates from being cleaned while the train was in motion, and that this, together with the engine failures due to leaking flues and poor steaming coal, was the proximate cause of the subsequent delays in meeting other trains; that the slow progress between stations was because of the faulty condition of flues and fuel. The court

below was of opinion that the railway company had fully established its defense and directed a verdict in favor of the defendant.

[1-3] The burden was upon the government to establish that the defendant had required or permitted its employés to remain on duty longer than 16 hours; this, being conceded, made a prima facie case. The excuses embodied in the proviso are separate and affirmative defenses (C., B. & Q. R. Co. v. U. S., 115 C. C. A. 193, 195 Fed. 241), which must be pleaded in the answer; and the burden is upon the defendant to sustain such allegations. Counsel for the railway company recognized this rule by the particularity with which they pleaded a latent defect in the coal, both at the outset and later by amendment, and also by assuming the burden of proof. If reliance was placed upon defects in the engine, such as a broken shaker rod and leaky flues, these defects should have been pleaded. The government should have been advised of the defenses it would be required to meet. The answer contains no such specific averments, and a general denial was insufficient for the purpose. It is contended, however, that court and counsel, by common consent, tried the case as though such alleged defects were embraced within the issues, and it is probably true that the record does not disclose any sufficiently specific objection to their consideration. Therefore, they will be treated as though set out in the answer.

Of a closely analogous statute—the Safety Appliance Law—the Supreme Court, in Johnson v. Southern Pacific Co., 196 U. S. 1, loc. cit. 17, 25 Sup. Ct. 158, 161 (49 L. Ed. 363) has said:

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers, and it was in that aspect remedial, while for violations a penalty of $100, recoverable in a civil action, was provided for, and in that aspect it was penal. But the design to give relief was more dominant than to inflict punishment, and the act might well be held to fall within the rule applicable to statutes to prevent fraud upon the revenue, and for the collection of customs; that rule not requiring absolute strictness of construction. (Citing cases.)

"Moreover, it is settled that, 'though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes; and they are not to be construed so strictly as to defeat the obvious intention of the Legislature.' United States v. Lacher, 134 U. S. 624 [10 Sup. Ct. 625, 33 L. Ed. 1080]."

[4] This law was passed to meet a condition of danger incidental to the working of railroad employés so excessively as to impair their strength and alertness. It is highly remedial, and the public, no less than the employés themselves, is vitally interested in its enforcement. For this reason, although penal in the aspect of a penalty provided for its violation, the law should be liberally construed in order that its purposes may be effected. United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471; United States v. St. Louis Southwestern Ry. Co. of Texas (D. C.) 189 Fed. 954. The recovery is by a civil action, and the rules governing civil procedure apply. St. Louis Southwestern Ry. Co. v. United States, 106 C. C. A. 136, 183 Fed. 770.

[5] The trial court, in sustaining defendant's motion for a directed verdict, indicated the view that the railway company was held to the exercise of ordinary care in anticipating causes of delay that might in-

terfere with observance of this law. This also is the position of defendant in error, and we are asked to apply the rule of construction adopted with respect to the Twenty-Eight Hour Law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1911, p. 1341]), which was enacted to prevent cruelty to animals by long confinement without rest while in transit by railroad. It is there provided that the carrier shall not confine domestic animals in cars for a longer period than 28 hours, without unloading them for rest, water, and feeding, unless prevented by causes "which cannot be anticipated or avoided by the exercise of due diligence and foresight." The carrier is liable for a penalty only when it "knowingly and willfully" fails to comply with the provisions of the law. This court has held that the words "knowingly" and "willfully" are designed to describe the attitude of a carrier, which, having a free will or choice, either intentionally disregards the statute, or is plainly indifferent to its requirements. St. Louis & S. F. R. Co. v. United States, 94 C. C. A. 437, 169 Fed. 69; St. Joseph Stockyards Co. v. United States, 110 C. C. A. 432, 187 Fed. 104. At all times the carrier has been held to the exercise of due diligence and foresight. The degree of such diligence, foresight, and care required depends largely upon the object aimed at and the situation presented; and whether the defendant has discharged the full duty laid upon it is to be determined from the facts and circumstances in each case.

The act under consideration does not employ the words "knowingly" and "willfully." The carrier is made liable if it requires or permits any employé to be or remain on duty in violation of stated provisions. This case then falls within that class where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong. Armour Packing Co. v. United States, 82 C. C. A. 135, 153 Fed. 1, 14 L. R. A. (N. S.) 400; s. c. 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; Chicago, St. P., M. & O. Ry. Co. v. United States, 90 C. C. A. 211, 162 Fed. 835. By the terms of the proviso the carrier is excused "where the delay is the result of a cause not known * * * at the time said employé left a terminal, and which could not have been foreseen." Not merely which was not foreseen, but which *could not have been* foreseen. The phrase "by the exercise of due diligence and foresight" is not present. Counsel argue that by leaving out this phrase Congress intended to limit the liability of the carrier; that it meant to imply that what was not actually foreknown could not, in contemplation of this law, have been foreseen. We cannot assent to this interpretation. Clearly Congress did not intend to relieve the carrier from responsibility in guarding against delays in a matter deemed to be of such importance. By this act it sought to prevent railroad employés from working consecutively longer than the period prescribed, as completely and effectively as could be accomplished by legislation. To bring itself within the exceptions stated, the carrier must be held to as high a degree of diligence and foresight as may be consistent with the object aimed at, and the practical operation of its railroad. Conformably to this view it has been uniformly held by the courts that, ordinarily, delays in starting trains

by reason of the fact that another train is late; from side-tracking to give superior trains the right of way, if the meeting of such trains could have been anticipated at the time of leaving the starting point; from getting out of steam or cleaning fires; from defects in equipment; from switching; from time taken for meals; and in short from all the usual causes incidental to operation—are not, standing alone, valid excuses within the meaning of this proviso. The carrier must go still farther and show that such delays could not have been foreseen and prevented by exercise of the high degree of diligence demanded.

[6] But three substantial matters of defense are presented for our consideration, the steaming qualities of the coal, the leaky flues of the engine, and the defective shaker rod, which is said to have made necessary the cleaning of grates at Spiro and to have occasioned a number of subsequent delays.

It is shown that the coal came from an approved source; that it was inspected and bore no evidence of defect. It does not appear to have given trouble on any other occasion. It was the same kind of coal that the company had been using for years on that division. The engineer did not notice any defects in it. The entire testimony adduced to impeach the quality of the coal is meager and indefinite. The most that can be claimed is that the engine did not steam properly, and therefore the court must conclude that the fuel contained some latent defect. This falls short of carrying the burden imposed upon the defendant. Such a contention, if indulged, would go far toward rendering the law inoperative. In the absence of any proof to the contrary, and much positive proof in its favor, the presumption must be that the coal was good. The failure to make steam is much more reasonably to be assigned to the poor condition of the engine itself. Its leaking flues are particularly urged upon our attention.

There is evidence that the flues of this engine leaked at some point on this trip, or, at least—as shown by the engineer's report—reached Stilwell in a leaky condition; but this would be no defense unless it appears that such a happening could not reasonably have been foreseen and prevented. Here, again, the testimony is indefinite and unsatisfactory. It is not shown when the leaking began. An attempt was made to prove inspection of the engine at Mena. This was confined to Billingsley, the engineer. His statement shows that his examination was a cursory one; in fact, insufficient to inform him whether the flues were stopped up or clear of cinders. At most he only opened the fire-box doors and looked in. He stated a general practice of examining the engine, and that it was the duty of the fireman to look after the flues. Whether he did so on this occasion does not appear. The fireman did not testify. The record shows that on April 17th and 19th, but two days apart, and less than a month prior to the happenings under consideration, the flues of this same engine were reported for examination, generally, and for leaks, under the heading "Repairs Needed." The engineer testified that when an engine gets old its flues will leak, and that the necessity for frequent repair of this nature indicates that they are beginning to fail. To meet the requirements of this law a railroad company must be held to a high degree of care to maintain

its equipment in good condition for service. The proof of diligence in this case is far from being conclusive in favor of defendant.

It appears that the grates of the fire box are freed from cinders and clinkers by shaking while the train is in motion, and during stops by means of a poker, which is carried for that purpose. When the fire is not burning well, it is customary to clean the grates while waiting at stations. At Spiro 30 minutes were consumed in cleaning fire, but whether the broken shaker rod prevented this from being done while the train was moving is not stated. This is, perhaps, left to be inferred. The engineer's report at the close of the trip contains this statement, "Reach rod to front gates broken." In his testimony the engineer says that the rod was broken some time on this trip, but does not know at what point. Later in the day, on May 11th, he took the same engine from Stilwell back to Spiro, and made another report asking further repairs to this same rod, which was then bent and out of use. As we have seen, no adequate inspection of this engine at Mena was shown. We have two engineer's reports on the same day, but following distinct trips, requesting repair to this reach rod. Under such circumstances, we may well doubt whether this appliance was in good condition when the trip started, and, if so, whether its derangement was not one of the ordinary incidents of operation which should have been anticipated. In the absence of any testimony fixing the time when this rod was broken, and that its defective condition occasioned the delay at Spiro for cleaning fire, we cannot hold that this defense, if it be one, was conclusively established.

The train dispatcher, throughout the trip, at least as far as Bunch, was fully aware of the progress this train was making and what trouble it was in. The conductor and crew were subject to his control. In traveling from Sallisaw to Bunch, a distance of 19 miles, 3 hours and 10 minutes had been consumed. At the latter station, by lightening his train a little more than one-half, the conductor, acting presumably, or at least constructively, under the orders of the train dispatcher, assumed that he could reach Stilwell—14 miles away—in less than an hour. The condition of engine and flues was then well known. The court below thought this was a reasonable exercise of discretion, but there is no provision that such discretion can supersede the mandate of the law. Economical reasons alone will not suffice.

The rule of law is well settled that it is only when all reasonable men, in the exercise of a fair and impartial judgment, would draw the same conclusions from the facts which condition the issue, that it is the duty of the court to withdraw that question from the jury. We do not think this record discloses such a situation. The case should have been submitted to the jury, under appropriate instructions, to determine whether the defendant had taken sufficient precaution to see that its engine was in proper condition when it started, and whether the delays which occurred were the result of causes which could not have been foreseen by exercise of the necessary diligence and foresight.

The judgment below must be reversed, and the case remanded for a new trial in accordance with these views.