OREGON SHORT LINE R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. July 10, 1916.)

No. 2716.

1. MASTER AND SERVANT ⊜⇒13—COMMON CARRIERS—HOURS OF SERVICE STATUTE.
   Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), declaring that it shall apply to any common carrier or carriers, their officers, agents, and employés, engaged in the transportation of passengers or property by railroad, and that the term "employé" shall be held to mean persons actually engaged in or connected with the movement of any train, by section 2 prohibits a carrier from requiring or permitting telegraph operators to remain on duty more than 9 hours; while section 3 provides that the carrier is deemed to have had knowledge of all acts of all its officers and agents, but excuses a violation if the result be of an unforeseen casualty or act of God. In violation of the defendant railroad's rules, a telegraph operator remained on duty more than 9 hours, performing clerical work after the expiration of that time. *Held* that, as the act is a remedial rather than a penal one, and as Congress before the passage of the act struck out the word "knowingly" before the word "permitting," in the phrase "requiring or permitting any employé to remain on duty," etc., the railroad company is liable, though no superior servant ordered the telegraph operator to remain on duty in violation of the statute; this being particularly true, as any other construction would render proof of a violation extremely difficult.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊜⇒13.]

2. CONSTITUTIONAL LAW ⊜⇒238(2), 275(2)—DUE PROCESS OF LAW—EQUAL PROTECTION.
   Such construction does not deny a railroad company due process of law and equal protection of law, guaranteed by Const. U. S. Amends. 5, 14.

   [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 689, 690, 706–708, 835, 844–846; Dec. Dig. ⊜⇒238(2), 275(2).]

In Error to the District Court of the United States for the Eastern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by the United States against the Oregon Short Line Railroad Company to recover penalties for violation of the Hours of Service Act. There was a judgment for plaintiff (228 Fed. 561), and defendant brings error. Affirmed.

George H. Smith, of Salt Lake City, Utah, and H. B. Thompson, of Pocatello, Idaho, for plaintiff in error.

Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C., and J. L. McClear, U. S. Atty., and J. R. Smead, Asst. U. S. Atty., both of Boise, Idaho.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The United States brought an action for judgment against Oregon Short Line Railroad Company to recover penalties under the act approved March 4, 1907 (34 Stat. L. 1415), entitled "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon." For a first cause of action plaintiff alleged that defendant, during the 24-hour period beginning at 7 a. m., April 2, 1915, at its office and station

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at Shelley, Idaho, "required and permitted" its certain telegraph operator and employé, A. R. Weston, to remain on duty for a longer period than 9 hours in that 24-hour period, namely, from 7 a. m. to 8 p. m.; that during all the times mentioned the office and station was one continuously operated night and day; and that the employé, while "required and permitted" to be and remain on duty, by the use of the telegraph or telephone received and delivered orders pertaining to and affecting the movement of trains engaged in interstate commerce. The allegations of the three causes of action that follow the first are similar, except for differences in dates and hours.

Defendant denied that during the 24-hour period commencing at 7 a. m. on April 2, 1915, at its office at Shelley, it "required and permitted or required or permitted" its telegraph operator and employé, Weston, to be or remain on duty for a longer period than 9 hours in said 24-hour period, but alleged that Weston on that day worked from 7 a. m. to 12 noon, and from 1 p. m. to 5 p. m., and that thereafter, on the same day, "without the knowledge, permission, or consent of this defendant," did continuously remain on duty, performing clerical work, but not as an operator, until 8 p. m. on that date. Defendant admitted that during the time mentioned said office and station was one continuously operated day and night, but denied that Weston, while required or permitted to be and remain on duty, did at any time of that date after 5 p. m. receive or deliver orders pertaining to or affecting the movement of trains engaged in interstate commerce. Defendant alleged that prior to April 2, 1915, it had issued and delivered instructions to all agents and operators, including Weston, prohibiting them from working in any capacity, or performing any service of whatsoever nature, in excess of 9 hours in any 24-hour period in any tower, office, station, or place continuously operated night and day, but that, notwithstanding such instructions and prohibition, Weston remained continuously on duty as operator for a period of 9 hours, and thereafter performed clerical services for an additional period of 3 hours, but that such clerical services were performed "without the knowledge, permission, or consent" of defendant, or any of its officers or agents, except Weston, who was at the time acting contrary to the express instructions mentioned. To the three causes of action next following, similar defenses were interposed.

The plaintiff's motion for judgment on the pleadings, on the ground that the allegations contained in the answer, if true, were insufficient to constitute a defense at law to the allegations of the complaint, was granted as to the first four causes of action, and this writ of error was brought.

[1] The material parts of the statute involved are as follows:

"Be it enacted * * * that the provisions of this act shall apply to any common carrier or carriers, their officers, agents, and employés, engaged in the transportation of passengers or property by railroad * * * and the term 'employés' as used in this act shall be held to mean persons actually engaged in or connected with the movement of any train.

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours:

* * * Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the day time, except in case of emergency. * * *

"Sec. 3. That any such common carrier, or any officer or agent thereof, requiring or permitting any employé to go, be, or remain on duty in violation of the second section hereof, shall be liable to a penalty of not to exceed five hundred dollars for each and every violation, to be recovered in a suit or suits to be brought by the United States district attorney. * * * In all prosecutions under this act the common carrier shall be deemed to have had knowledge of all acts of all its officers and agents: Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen. * * * "

We regard the statute as one not dealing with violations of the criminal law, but as remedial in its nature and effect, designed to protect persons traveling by way of interstate carriers, and the employés of such carriers, by preventing conditions that necessarily are more or less conducive to danger to both such travelers and employés. And although it may be called punitive in so far as it prescribes penalties for its violation, still the primary rule of construction is that which will make the law effectual in its main purpose. The act is analogous to Safety Appliance Act March 2, 1893, c. 196, 27 Stat. L. 531 (Comp. St. 1913, §§ 8605–8612), which is entitled "An act to promote the safety of employés and travelers upon railroads by," etc. The Hours of Service Act here involved, approved March 4, 1907 (34 Stat. 1415), is entitled "An act to promote the safety of employés and travelers upon railroads by," etc. The Supreme Court, in Johnson v. Southern Pac. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, in speaking of the Safety Appliance Act, said:

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers, and it was in that aspect remedial, while for violations a penalty of $100, recoverable in a civil action, was provided for, and in that aspect it was penal. But the design to give relief was more dominant than to inflict punishment, and the act might well be held to fall within the rule applicable to statutes to prevent fraud upon the revenue, and for the collection of customs; that rule not requiring absolute strictness of construction."

In United States v. Atlantic Coast Line Railroad Co., 211 Fed. 897, 128 C. C. A. 275, the Court of Appeals for the Fourth Circuit, construing the hours of service statute, cited Johnson v. Southern Pac. Co., supra, and said:

"This is not a criminal statute, and therefore is not governed by the rule of strict construction. * * * It is rather a remedial statute, which should be so construed, if its language permits, as to best accomplish the protective purpose for which it was enacted. * * * Obviously, that purpose was to promote the safety of employés and the traveling public by prohibiting hours of service which presumably result in impaired efficiency for discharging their important duties. The end to be attained by the law is a guide to its interpretation."

See Chicago, B. & Q. Railway Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; United States v. Kansas City Southern Railway Co., 202 Fed. 828, 121 C. C. A. 136; Delano et al. v. United States, 220 Fed. 635, 136 C. C. A. 243; United States v. Boston & M. Railroad Co. (D. C.) 168 Fed. 148.

Counsel for the railroad company argue that the statute makes a clear distinction between officers and agents who may require or permit an employé to work in excess of the periods therein prescribed, and such employé; that by part of section 1 the provisions of the act apply to any common carrier or carriers, their officers, agents, and employés, and by other words the term "employés," as used in the act, "shall be held to mean persons actually engaged in or connected with the movement of any train." They then argue that, as it is provided by section 3 of the act that "any such common carrier, or any officer or agent thereof, requiring or permitting any employé to go, be, or remain on duty in violation of the second section hereof, shall be liable to a penalty," it must be that officers and agents who may require or permit such employés to remain on duty in violation of the statute are on a different footing from the employés. They say that, as a carrier cannot require or permit the employés to be on duty except by direction or consent of an officer or agent, permission to do the thing inhibited "must flow from some superior source, and cannot come from an inferior, or one of equal rank, and therefore authority to violate the statute cannot reside in the employé himself." As we understand it, the essence of this position is that neither the carrier nor any of its officers or agents can be adjudged guilty, unless it is first found that one of such officers or agents charged with the duty of supervising and regulating hours of service of "employés" has required or permitted the employé to work in excess of the prescribed time.

It is not to be denied that the train dispatcher who gives orders to other men with relation to the movements of trains is an employé, as are the men who obey his orders; nor is it to be disputed that service by such dispatcher in excess of the prescribed hours for service would be a violation of the provisions of the act; but so would service in excess of prescribed hours by one of the men working under him, and, being a violation of the act, both being employés, the carrier would become responsible for the acts of both. The statute in its comprehensive terms is applicable to carriers, their officers, agents, and employés—employés, of course, being as defined. Our example may be brought closer to the present case. The superior—say the head or division telegrapher of a carrier—may become personally liable if he allows one of his subordinate railroad telegraphers to work about train operations in excess of the prescribed limit, although the operator employé who sends and delivers the message may not be. The liability in the one instance springs from the fact that the superior has authority to supervise and direct, and in the exercise of such authority he may require or permit a subordinate to work in excess service; while the subordinate, often performing duties in obedience to orders, has no power or control over any person other than himself,

and may not "require or permit" another to do so. Nevertheless, both such persons are employés; both may be delivering and receiving orders pertaining to or affecting train movements; and as employés, when so engaged, both superior and subordinate, are fairly in relationship of agency to their employer, the carrier.

In thus giving to the word "agents," as Congress has used it in the statute, a broad interpretation, we harmonize the letter and purpose of the statute by holding it to be practically and vigorously remedial in promoting safety. The evident spirit of the law, as gathered from its terms, is to impose upon the carrier positive duty, for in case of prosecution it expressly imputes to the carrier knowledge of all acts of all its officers and agents. We find no room for a construction other than that defense of actual lack of knowledge is foreclosed to the carrier. It "shall be deemed to have had knowledge of all acts of all its officers and agents." Manifestly Congress, in making this rule of interpretation, had in mind the difficulties which would confront prosecutions if actual knowledge by the carrier through its superior representatives had to be proved. Suppose that a telegraph operator, through physical fatigue due solely to working for his employer carrier hours beyond what a man ought reasonably to be able to work, fails to receive and deliver a train order, and that as a result there is a collision and life is lost; is it the intent of the law that the carrier will not be held liable because it has given orders that no employé should work excessive hours, and because its officers or superiors in charge have had no actual knowledge that the operator who failed to receive and deliver the message was working in excess of hours? Such a construction would well-nigh destroy the avowed object of the statute by taking away the obligation which we believe it imposes upon the carrier to see to it that none of its employés engaged in the movement of its trains shall work in excess of prescribed hours, except where emergency conditions, not here relevant, are presented.

The rule of absolute liability logically follows the command that knowledge of all acts of all agents shall be deemed to have been had by the carrier; and as aiding in arriving at the intent to impose absolute liability in general, it is important to note the special proviso of section 3, which withdraws the general applicability of the act from "any case of casualty or unavoidable accident or the act of God," or "where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen," and also makes it inapplicable to the crews of wrecking trains. By these special exclusions of liability of the carrier, and by specific reference to instances where lack of knowledge by the carrier or its officers or agents in charge may avail, and by expressly excluding employés on wrecking crews from the operation of the statute, emphasis is given to the reasonableness of the construction which, when considered with imputed knowledge, makes liability absolute.

To require or permit an employé to work ordinarily implies knowledge by the employer, who exacts or consents to the doing of the work.

Upon this point reference to the history of the passage of the act is relevant. In the report to the House of Representatives, Fifty-Ninth Congress, May 31, 1906, which accompanied the bill to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon, the opinion of the committee was expressed that it ought not to be left to the discretion of the men themselves as to whether they should work excessive hours or not, and the opinion of the committee was that:

"The law itself should fix the maximum limit and provide sufficient penalties for any violation thereof. Neither the cupidity of the men nor of railroad managers should control in a matter of such vital interest to the public safety."

The Congressional Record also shows that the word "knowingly" was inserted in the bill during the earlier stages of its progress in the House of Representatives. Congressional Record, Fifty-Ninth Congress, February 18, 1907, p. 3251.

Section 3 of the House Bill originally read:

"That any such common carrier, or any officer or agent thereof, requiring or knowingly permitting any employé to go, be, or remain on duty in violation of the second section hereof."

Thereafter (Congressional Record 1907, p. 3755) the committee on rules reported to the House of Representatives that the bill entitled "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon" should be taken up for consideration, and that the amendment recommended by the committee on interstate and foreign commerce should be agreed to, with an amendment which would strike out the word "knowingly" in section 3 just heretofore referred to; and on March 4, 1907, when the bill was finally enacted into the law now on the statute books, the word "knowingly" had been stricken out in accordance with the recommendation of the committee on rules. We attach very great significance to the action of Congress in expressly excluding the word "knowingly," for, in our opinion, it overthrows the force of the contention of the carrier, and sustains the interpretation which we have put upon the statute.

As sustaining our conclusions we cite these opinions of the Supreme Court construing the Safety Appliance Act: St. Louis, I. M. & S. Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; Chicago, B. & Q. Ry. Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; Delk v. St. Louis & San Francisco Railroad Co., 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 590—and the opinions of other federal courts construing the Hours of Service Act: United States v. Oregon-Washington Railroad & Navigation Co. (D. C.) 218 Fed. 925; San Pedro, L. A. & S. L. Railroad Co. v. United States, 213 Fed. 326, 130 C. C. A. 28. United States v. Oregon-Washington Railroad & Navigation Company (D. C.) 213 Fed. 688, was reviewed by this court in 223 Fed. 596, 139 C. C. A. 142, and the judgment affirmed. While the court rested its decision upon somewhat different facts from those here presented, the doctrine of imputed knowledge was recognized.

[2] We find no substantial ground for the suggestion that the construction which we have put upon the law would deny to this defendant due process of law and equal protection guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States. Chicago, B. & Q. Railway Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582.

The fault of the carrier having been established by the pleadings, liability followed, and judgment was properly ordered.

Affirmed.