## ATCHISON, T. & F. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 9, 1917.)

No. 4764.

1. MASTER AND SERVANT ⬳13—HOURS OF SERVICE ACT—CASUALTY OR UN-
AVOIDABLE ACCIDENT.

A railroad train parted on a curve, where the track descended a
heavy grade from either side to cross a natural depression. The auto-
matic couplers, slipping, passed by each other because of worn places on
the faces of each knuckle, due to the attrition of coupling and trac-
tion against similar knuckles. It appeared that the cars had been
recently inspected, and that the usual inspection before the train started
was made, but that the defect was not discovered. There was evidence
that it could have been discovered only by the use of a gauge used by
railroads for measuring such couplers. By reason of the parting of the
train the railroad company kept employés on duty for more than 16 hours.
*Held* that, as the railroad company might have used a gauge for the in-
spection of the couplers, the accident cannot be deemed a casualty or
unavoidable accident as a matter of law, within the Hours of Service Act,
providing that it shall not apply in case of casualty or unavoidable acci-
dent or act of God, and hence the railroad company could not escape
liability for keeping its employés on duty for more than 16 hours in
violation of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

2. MASTER AND SERVANT ⬳13—OPERATION OF RAILROAD—HOURS OF SERVICE
ACT.

A train telegraph operator at a station operated at night as well as day
was required to remain on duty more than 9 hours to care for the
United States mails, but he performed no services as train dispatcher
after the expiration of the 9-hour period prescribed by the Hours of Serv-
ice Act (Act March 4, 1907, c. 2939, 34 Stat. 1415 [Comp. St. 1916, §§
8677–8680]). *Held*, that such fact did not exempt him from the protection
of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

3. MASTER AND SERVANT ⬳13—OPERATION OF RAILROAD—HOURS OF SERVICE
ACT.

A telegraph operator, whose regular period of service was from 3:30 p.
m. to 12:30 a. m. each day, was directed to remain on duty to care for
the United States mails, which were to be transmitted to and re-
ceived from a passenger train scheduled to pass the station at 10:15 p. m.
The train on this particular evening was known to the railroad company's
officials to be 2½ hours late into a somewhat distant station, and it had
been losing instead of gaining time. There was another employé at the
station, who was under no restriction as to hours of service, but he was
not bonded, and the railroad company made no effort to have him care for
the mails. *Held* that, notwithstanding the company's officials had
expectations that some of the lost time would be made up, and despite the
fact that there was a considerable margin between the operator's hours
and the scheduled time for the trains, the railroad company was guilty of
violation of the Hours of Service Act in requiring its operator to re-
main on duty more than 9 hours, for, if it desired a bonded employé to
handle the mail, it should have a sufficient supply of such help subject to
call.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

4. MASTER AND SERVANT ⬳18—OPERATION—HOURS OF SERVICE.

A railroad company, which keeps employés on duty for longer time
than authorized by the Hours of Service Act, has the burden of showing

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that the causes of the excess service fall within the proviso of the act allowing the excess service.

5 APPEAL AND ERROR ☞204(2)—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—NECESSITY.

In an action against a railroad company for the penalty for violating the Hours of Service Act by retaining train employés on duty for more than 16 hours, the railroad company defended on the ground that two accidents had happened to the train. For the purpose of showing a negligent habit on the part of the company, the government introduced evidence of numerous accidents similar to one of those set up by the railroad company. Such evidence was limited in its effect to the question of the diligence the company should have exercised in inspection of the train. On appeal the company objected to the admission of such evidence, on the ground that one of the accidents was unusual in its character and different from those shown by the government. *Held*, that, as such question was not presented to the trial court and no exception saved, it could not be raised on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1260, 1261, 1280.]

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action by the United States against the Atchison, Topeka & Santa Fé Railway Company. There was a judgment for the United States, and defendant brings error. Affirmed.

Charles H. Woods, of Oklahoma City, Okl. (Robert Dunlap, of Chicago, Ill., and J. R. Cottingham and S. W. Hayes, both of Oklahoma City, Okl., on the brief), for plaintiff in error.

Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C., and W. Boothe Merrill, Asst. U. S. Atty., of Oklahoma City, Okl. (John A. Fain, U. S. Atty., of Lawton, Okl., and Roscoe Walter, Asst. U. S. Atty., of Washington, D. C., on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and RINER and MUNGER, District Judges.

MUNGER, District Judge. The United States, hereafter called plaintiff, brought an action against the Atchison, Topeka & Santa Fé Railway Company, hereafter called defendant, for violation of the Hours of Service Law (34 Stat. 1415, 8 U. S. Comp. Stats. Ann. §§ 8677–8680).

[1] There were six counts in the petition. The case was submitted to a jury on the issues as to the first five counts, and a verdict was found in favor of the plaintiff on each of these counts, and a verdict was also returned in favor of the plaintiff on the sixth count, by direction of the court. In each of the first five counts it is charged that the defendant required and permitted a trainman connected with train No. 93 to remain on duty for more than 16 hours—from 2 o'clock a. m. to 7:45 o'clock p. m. on December 6, 1913. The defendant's answer admitted that these employés were on duty over 16 hours, but alleged the excess of service was because of unavoidable accidents—once when the cars pulled apart at Mile Post 270, because the knuckle pin holes and the knuckle locks between two of the cars permitted the knuckle locks to

slip by each other, and again when a drawbar pulled out at Skeedee. It was also alleged that before leaving the terminal the train was thoroughly inspected by skilled inspectors, who found no defects, and that the causes of the accident could not have been foreseen by the exercise of due care.

A proviso to the Hours of Service Act reads as follows:

"Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen."

The defendant complains because the court did not direct a verdict in its favor on the first five counts, and claims that the evidence clearly showed that it had brought itself within the terms of this proviso. It concedes that the accident at Skeedee need not be considered on this assignment of error, if the evidence was sufficient to send the case to the jury as to 'the first accident.

The defendant had offered proof to show that the parting of the train at Mile Post 270 occurred on a curve at a place where the track descended a heavy grade from either side to cross a natural depression. The automatic couplers were not broken when they slipped by each other. Worn places were found on the faces of each knuckle, due to the attrition of coupling and traction against similar knuckles. Nothing indicated this condition to be recent. The trainmen gave their opinions that the causes of the uncoupling were the curves in the track and the worn condition of these knuckles. The defendant then offered proof of inspection of one of these cars six days, and of the other three days, before this train departed; these inspections having been made on arrival of the cars in other trains. Another inspection was made just before the train started on its journey. This inspection was made at night after the train was coupled together, by lantern light; the two inspectors examining, not only the couplers, but also the draught rigging, the brake rigging, and the framework of the cars. The usual time given to an inspection of a train of this kind, which consisted of 59 cars, was 30 minutes. Some of the defendant's own witnesses testified that worn surfaces, such as existed on these couplers, would not be observable to the eye of an inspector under these circumstances, and that the only method of discovering them would be by the use of a gauge. This gauge is an instrument in practical use by railroads for measuring these couplers, and the defendant had such gauges at their shops at the terminal from which the train started. There was no testimony that these couplers had been examined at any time by means of this appliance. In Denver & R. G. R. Co. v. United States, 233 Fed. 62, 147 C. C. A. 132, it was said:

"A carrier must use diligence to anticipate, as this court held in United States v. Kansas City Southern Railway Co., 202 Fed. 828, 121 C. C. A. 136, 'all the usual causes incidental to operation.' And when any casualty occurs the carrier must still use diligence to avoid keeping its employés on duty overtime. Failure to perform either of those duties deprives it of the benefit of the proviso. Poor coal, meeting of trains, switching, defective shaker rod, leaky flues (United States v. Kansas City Southern Ry. Co., 202 Fed. 829,

121 C. C. A. 136), pulled-out drawbar, bursted air hose (United States v. Great Northern Railway Co., 220 Fed. 630, 136 C. C. A. 238), extraordinary head wind, heavy grain movement, hot box (Great Northern Railway Co. v. United States, 218 Fed. 302, 134 C. C. A. 98, L. R. A. 1915D, 408), high wind, broken tail pin, hot box (United States v. Lehigh Valley Railroad Co., 219 Fed. 532, 135 C. C. A. 282), have been held to be causes of delay 'incidental to operation.' We stated generally in United States v. Kansas City Southern Railway Co., 202 Fed. 828, 121 C. C. A. 136, that: 'It has been uniformly held by the courts that ordinarily delays in starting trains by reason of the fact that another train is late; from side tracking to give superior trains the right of way, if the meeting of such trains could have been anticipated at the time of leaving the starting point; from getting out of steam or cleaning fires; from defects in equipment; from switching; from time taken for meals; and in short from all the usual causes incidental to operation—are not, standing alone, valid excuses within the meaning of this proviso.' As to such causes of delay we said: "The carrier must go still further and show that such delays could not have been foreseen and prevented by exercise of the high degree of diligence demanded.'"

It is obvious that the cause of the delay at Mile Post 270 was a defect in equipment. The defendant was bound to use due diligence to provide and keep in repair couplers that would stand the stress of the lateral and vertical curvature of the track over which it dispatched its trains. Although there was evidence that this accident was of an unusual kind, the defendant was bound to anticipate that couplers would wear to inefficiency, and there was sufficient evidence from which the jury could find that the uncoupling could have been foreseen by proper inspection, and that such diligence had not been supplied.

[2, 3] The sixth count of the petition charged that the defendant required and permitted a telegraph operator at Orlando, Okl., to remain on duty for more than 9 hours in a 24-hour period. The answer to this count admitted that the operator remained on duty over 9 hours, but said he did so to care for the United States mail about to arrive on a passenger train. This train should have reached the station, according to schedule, during the 9 hours of service of this operator, but was 4 hours late. It is alleged this delay was the result of causes beyond the defendant's control, and was not known to the defendant in time to get some one else to care for the mail, and there was no other person available at the station to care for it on the arrival of the train, and that these facts constituted an emergency within the meaning of the statute. The operator had a regular period of service from 3:30 p. m. to 12:30 a. m. each day. A passenger train from the north carrying mail was due at his station at 10:15 p. m., according to the regular schedules. The train did not stop at his station, but threw off incoming mail, and caught the outgoing mail, by an automatic device, as it passed. The train passed this station on this night at 2:20 a. m. The operator was directed to remain on duty to attend to the mail for this train, and did so. He performed no duties as train dispatcher after 12:30, but this fact did not exempt him from the protection of the statute. Delano v. United States, 220 Fed. 635, 136 C. C. A. 243. The specific duties laid upon the operator in caring for this mail consisted in his hanging the outgoing mail sack on the crane 15 minutes before, and watching it until the arrival of the train, and in placing in the depot the mail sacks that were thrown off of the train. The mail received was left at the

depot until morning. There was another operator, who also served as station agent, and whose hours of duty ran from 5:30 a. m. to 3:30 p. m. A helper was furnished to these operators, who served from 7:00 a. m. to 7:00 p. m. The defendant required bonds from each of the operators for the faithful performance of their duties relating to the handling of mail, but the helper also handled the mail during his hours of duty.

The causes of the delay of the train on this date arose from the fact that the train waited at a junction point for the arrival of a regularly connecting train from Chicago. The Chicago train had been delayed along its route by various causes, such as stops for crossings, taking coal, head winds, snow, cold weather, and two ordinary breakages of appliances on the engines, requiring the substitution of other locomotives. If the train had arrived according to schedule, it would have reached Orlando 2¼ hours before the end of the operator's hours of service. At 9:52 a. m., the train was 2½ hours late into Kansas City. At 2:55 p. m. it was 2 hours and 25 minutes late into Newton, Kan. This was known to the defendant before the operator began his employment at Orlando at 3:30 p. m. At 7:34 it was known the train would be at least 2 hours and 25 minutes late into Arkansas City, and it was actually 3 hours and 40 minutes late on its arrival there at 10:55 p. m. Orlando was 69 miles from Arkansas City. The defendant's officials had expectations that some of the lost time would be made up. The trial court was of the opinion that these circumstances did not make an emergency, and so instructed the jury. In the practical operation of its road, the carrier is bound to anticipate such frequent occurrences as ordinary delays of trains. United States v. Chicago & N. W. Ry. Co. (D. C.) 219 Fed. 342; United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 121 C. C. A. 136; United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471. Had the margin between the regularly scheduled arrival of the train and the termination of the operator's service been but a few minutes, and had no other provision for caring for the mail been made, it would seem obvious that the carrier could not claim an emergency existed each time the train was delayed over that brief period. While the margin of safety in this case was 2 hours and 15 minutes, occasional delays beyond that period were inevitable in ordinary railroading. The helper, who was not subject to the Hours of Service Act, was not called upon for assistance on this occasion, nor was any effort made to supply the service, after the train was known to be so delayed that its arrival at Orlando on time was dangerously problematical. In the case of United States v. Southern Pac. Co., 209 Fed. 562, 126 C. C. A. 384, this court said:

"If the usual causes of delay incident to operation were to excuse, then the statute would be wholly ineffective to accomplish its purpose."

The defendant urges that its policy forbade the handling of mail by others than bonded employés, but its failure consisted in not having a sufficient supply of such help, if it wished to impose such restrictions. There was no error in the direction of the verdict on the sixth count.

[4] The trial court correctly placed the burden of proof on the defendant to show that the causes of the excess service of the train crew

came within the terms of the proviso to the Act of Congress. Chicago, B. & Q. R. Co. v. United States, 195 Fed. 241, 115 C. C. A. 193; Great Northern Ry. Co. v. United States, 218 Fed. 302, 134 C. C. A. 98, L. R. A. 1915D, 408; United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 121 C. C. A. 136; United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471; United States v. Houston Belt & Terminal Ry. Co., 205 Fed. 344, 125 C. C. A. 481; Denver & R. G. R. Co. v. United States, 233 Fed. 62, 147 C. C. A. 132.

[5] The plaintiff offered in evidence 14 official reports by conductors of accidents that had occurred upon the line of railroad south of Arkansas City within 5 weeks prior to the accidents involved in this case. Complaint is made of the overruling of defendant's objections to them. In support of its objection the defendant now says that the only material issue was the accident at Mile Post 270, and as that arose from a break in two, caused by the knuckles slipping by each other, and these reports relate to the pulling out of drawbars and draught members, the dissimilarity made them immaterial. In reaching this conclusion the defendant assumes that the excess over 16 hours of service was less than the delay at Mile Post 270. The condition of the case when the trial court made its ruling was as follows: The plaintiff had alleged that the train crew had been employed for $17\frac{3}{4}$ hours; the defendant's answer admitted a service of 17 hours and 25 minutes, but alleged as an excuse that two unavoidable accidents had caused the delay, the one at Mile Post 270, caused by the knuckles slipping by, and the other at Skeedee, caused by a drawbar pulling out; that a proper inspection of these cars had been made at the terminal before the train started. The defendant's witnesses had testified as to both of these accidents, and to consequent delays of 1 hour and 30 minutes at Mile Post 270, and of 25 minutes at Skeedee. Defendant's testimony showed that, at the end of 17 hours and 25 minutes of service by the train crew, a switch engine and crew met this train, and coupled onto it, and pulled it for the next 20 minutes into the terminal; the engineer and fireman remained on the train engine and the other trainmen on the cars, and they entered on the register at the terminal both the time when the switch crew met them and the final arrival.

In this condition of the proof, the plaintiff offered the 14 reports of accidents, on the theory expressed in the case of United States v. Great Northern Ry. Co., 220 Fed. 630, 136 C. C. A. 238, that evidence of many similar accidents immediately preceding these accidents was admissible as tending to show a negligent habit of the railway company. The court, in admitting it, limited its effect in measuring the diligence the railway company should have exercised in its inspection of this train from its previous experiences. If these accidents lacked identity with the one at Mile Post 270, they were essentially similar to the one at Skeedee. No specific objection was made to the applicability of this evidence to the consideration of the accident at Mile Post 270, nor was any request made by the defendant that its effect be limited. The trial continued on the theory, which the defendant had introduced into the trial, that both of the accidents to this train were material, and the case was submitted to the jury for a finding as to the materiality of each of the accidents, and no exception was taken by the defendant. As the

question now raised was not presented to the trial court, and an exception saved, it is urged too late.

The judgment will be affirmed.